Ronald HILL, Plaintiff-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION, and Marten Transport, Ltd., Defendants-Respondents.

Court of Appeals

No. 92–3275. *Submitted on briefs September 13, 1993.—Decided April 14, 1994.*

(Also reported in 516 N.W.2d 441.)

For the plaintiff-appellant the cause was submitted on the briefs of *Sally A. Hestad* of *Action Law, S.C.* of Madison.

For the defendant-respondent, Labor and Industry Review Commission, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Richard Briles Moriarty*, assistant attorney general.

For the defendant-respondent, Marten Transport, Ltd., the cause was submitted on the brief of *Christopher D. Walther* of *Christopher D. Walther & Associates, S.C.* of Milwaukee.

Before Gartzke, P.J., Dykman and Sundby, JJ.

DYKMAN, J.   Ronald Hill appeals from an order affirming the Labor and Industry Review Commission's (LIRC) dismissal of his § 102.35(3), STATS., claim against Marten Transport, Ltd. for wrongful refusal to rehire.[1] The issues are: (1) whether LIRC incorrectly interpreted § 102.35(3) by requiring Hill to show that he had communicated to Marten an interest in returning to employment in some capacity other than as an over-the-road truck driver; (2) whether LIRC's finding that Hill "failed to affirmatively ask for reemployment" in a different capacity is supported by any credible evidence; and (3) whether LIRC erred in taking notice of the distance between Mondovi and Portage, Wisconsin, when such evidence had not been

---

[1] Section 102.35(3), STATS., provides in relevant part:

Any employer who without reasonable cause refuses to rehire an employe who is injured in the course of employment, where suitable employment is available within the employe's physical and mental limitations, upon order of the department and in addition to other benefits, has exclusive liability to pay to the employe the wages lost during the period of such refusal, not exceeding one year's wages.

considered by the administrative law judge (ALJ), and Hill had not been permitted to offer rebuttal evidence.

We conclude that LIRC's construction of § 102.35(3), STATS., is entitled to great weight, and that we must affirm LIRC's interpretation because it is reasonable. Furthermore, we hold that credible evidence supports LIRC's finding that Hill failed to express interest in other employment. Finally, we do not decide whether LIRC improperly considered the distance between the two municipalities because Hill was not prejudiced by the asserted error. Therefore, we affirm.

## BACKGROUND

Hill was employed by Marten as an over-the-road truck driver. On July 23, 1986, Hill broke his right ankle and wrist and injured his back in a fall from the cab of his truck. Temporary total disability payments commenced immediately.

By January 1987, Hill applied to the Wisconsin Department of Health and Social Services, Division of Vocational Rehabilitation (DVR), for assistance in obtaining employment or retraining. In March 1987, a DVR counselor contacted Marten about Hill's eligibility for rehire as a truck driver. Marten declined to give a definitive answer in the absence of a physician's report outlining what permanent disability, if any, Hill suffered and how that disability would affect his performance as a driver. In April 1987, a Marten employee informed the DVR counselor that there were no office positions available, and that he felt that returning as a truck driver would not be appropriate for Hill.

In the summer of 1987, DVR referred Hill to a psychologist, and Marten arranged for a consultant to conduct a vocational evaluation of Hill. Hill informed the psychologist that he did not hope to return to truck

driving because he was "burned out on it." However, Hill indicated that he might like to remain in transportation. The consultant's report noted Hill's experience in the trucking industry, including a period in which Hill and his wife owned and operated a company which hauled heavy equipment and steel. The consultant recommended that if Hill were to be restricted to activities of a sedentary nature with minimal lifting and walking, Hill should consider occupations in the areas of transportation distribution management or marketing, retailing of trucking-related products, dispatching or bus driving.

The DVR's case notes from August 1987 state that Hill had inquired into a transportation administration program at Madison Area Technical College (MATC) and found that the school offered a night program which would take five years to complete. Hill expressed his preference for a two-year program in business administration. The notes also indicate that Hill expressed concern about relocating to Mondovi, where Marten's offices were located, because of the limited employment opportunities for his wife.

To alleviate Hill's persistent lower back pain, a lumbar laminectomy was performed in January 1988. In a report dated November 18, 1988, Dr. Elliot Coles determined that Hill had reached the end of his healing period, and assigned permanent partial disability ratings of twenty-five percent to the right ankle, twenty percent to the right wrist, and twenty percent overall. Marten conceded the disabilities and made payments accordingly. Marten also conceded vocational rehabilitation maintenance payments which commenced on November 18, 1988, and extended for forty weeks. Prior to Dr. Coles's examination, Hill had enrolled in an electronics repair course at MATC.

Hill claims that on December 5, 1988, he called Debra Hayden, an administrative assistant in Marten's office, and inquired about courses he could take to qualify for an office position with Marten. Hayden allegedly informed him that no office jobs were available, and that it would be useless for him to come into the office at that time. Hill also claims that he regularly phoned Hayden for nearly a year and received similar responses to his inquiries about office positions. Hayden stated that it was Marten's policy that employees receiving worker's compensation benefits contact the office on a weekly basis. While she recalled discussing retraining with Hill, Hayden could not remember any conversations about office jobs.

Hill obtained employment with Wisconsin Farm Lines as a risk manager and safety director in October 1989. He remained in that job until May 1990. Hill then became operations manager at Gateway Transportation, a position he held at the time of his hearing before the ALJ, and which paid an annual salary of $35,000. Marten notified Hill that his employment had been terminated as of February 21, 1990, because he was no longer able to perform his duties as a truck driver.

A hearing on Hill's claim against Marten for wrongful refusal to rehire was held in March 1991. In his decision, the ALJ stated that it was not necessary for Hill to have formally applied for an office position—all that was required was that Hill had made it known to Marten that he was interested in such work. The ALJ found that Hill did so on numerous occasions, and that there was no good reason for Marten not to rehire Hill, given the expansion of Marten's fleet and Hill's extensive experience in the industry. The ALJ found Marten in violation of § 102.35(3), STATS., for

more than a year after Hill's termination and ordered Marten to pay a year's wages, or $37,908.

Marten appealed the order to LIRC, asserting the following errors: (1) the ALJ disregarded the parties' stipulation that Hill's maximum weekly wage in 1986 was $493.50; (2) the amount of the ALJ's award was not supported by the record; (3) the ALJ failed to consider the wages Hill earned at Wisconsin Farm Lines or Gateway during the refusal period; and (4) Hill never expressed interest in a specific job except truck driver.

LIRC reviewed the record and conferred with the ALJ concerning the witnesses' credibility. In its memorandum opinion, LIRC noted that to establish a *prima facie* case for unreasonable refusal to rehire, a claimant must show that: (1) he was an employee; (2) he sustained an injury while on the job; (3) he applied for rehire; and (4) he was denied rehiring because of the injury. *See West Bend Co. v. LIRC*, 149 Wis. 2d 110, 126, 438 N.W.2d 823, 830-31 (1989). Addressing the third requirement, LIRC concluded that:

> [W]here an employe is released by his physician after an extended period of total disability with significant permanent restrictions that all parties agree will preclude the employe from returning to the type of work he always did for the employer, it is appropriate to impose on the employe some type of obligation of communicating to the employer the extent of his interests, if any, in returning to employment with that employer in a *different* capacity.

LIRC found that Hill neither was interested in reemployment in some other capacity with Marten nor expressed such interest to Marten. Therefore, LIRC

dismissed his claim. The trial court affirmed LIRC's order on review, and this appeal followed.

## STANDARD OF REVIEW

■

The scope of our review is identical to that of the trial court. *West Bend Co.*, 149 Wis. 2d at 116-17, 438 N.W.2d at 826-27. We review the decision of the commission rather than the trial court. *Id.* at 117, 438 N.W.2d at 827.

The parties sharply disagree as to the deference this court owes LIRC's statutory interpretation. In *West Bend Co.*, 149 Wis. 2d at 117, 438 N.W.2d at 827, the supreme court independently reviewed LIRC's construction of 102.35(3), STATS., the statute at issue in this case. Similarly, we have reviewed LIRC decisions interpreting § 102.35(3) and applied a *de novo* standard because the statute was relatively new, and its legislative history and judicial interpretation were sparse. *Dalco Metal Prods., Inc. v. LIRC*, 142 Wis. 2d 595, 602-03, 419 N.W.2d 292, 295 (Ct. App. 1987); *Link Indus., Inc. v. LIRC*, 141 Wis. 2d 551, 554-55, 415 N.W.2d 574, 576 (Ct. App. 1987).

■

However, in *Jicha v. DILHR*, 169 Wis. 2d 284, 485 N.W.2d 256 (1992), and subsequent cases,[2] the supreme court has discussed the three levels of deference that appellate courts accord statutory interpretation in agency decisions. First, if the agency's experience, technical competence and specialized knowledge assist the agency in applying the statute,

---

[2] *See William Wrigley, Jr., Co. v. DOR*, 176 Wis. 2d 795, 800-01, 500 N.W.2d 667, 669-70 (1993); *Kelley Co. v. Marquardt*, 172 Wis. 2d 234, 244-45, 493 N.W.2d 68, 73 (1992).

the agency's interpretation receives great weight. *Id.* at 290-91, 485 N.W.2d at 258-59. Second, if the agency's decision is very nearly one of first impression, it will be given due weight or great bearing. *Id.* at 291, 485 N.W.2d at 259. Finally, where it is clear that the case is one of first impression for the agency and the agency lacks special expertise in deciding the question presented, the review is *de novo. Id.*

We conclude that under *Jicha*, the great weight standard would be appropriate because of the experience LIRC has acquired in interpreting the statute since its enactment in 1975. Furthermore, there now exists sufficient case law to guide LIRC in its application of the statute. Finally, LIRC possesses expertise in administering cases under the worker's compensation statutes.

The conflict among the various precedents raises the question of which governs the case before us. When decisions of our supreme court appear to be inconsistent, we follow the court's most recent pronouncement. *State v. Clark*, 179 Wis. 2d 484, 493, 507 N.W.2d 172, 175 (Ct. App. 1993). Furthermore, where our decisions conflict with a subsequent supreme court opinion, we adhere to the latter. *Id.* at 493-94, 507 N.W.2d at 175. Therefore, we will give great weight to LIRC's interpretation of § 102.35(3), STATS., and affirm it if it is reasonable, even though an alternative view is also reasonable. *West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 13-14, 357 N.W.2d 534, 540 (1984).

With respect to LIRC's findings of fact, we are bound by those findings if there is credible evidence to support them. *West Bend Co.*, 149 Wis. 2d at 117-18,

438 N.W.2d at 827. We may not substitute our judgment for LIRC's as to the credibility of witnesses or the weight to be accorded to the evidence. *Id.* at 118, 438 N.W.2d at 827. Finally, even if LIRC's findings appear contrary to the great weight and clear preponderance of the evidence, we must uphold them if they are supported by any credible evidence. *Id.*

## LIRC'S INTERPRETATION OF § 102.35(3), STATS.

Hill argues that LIRC acted in excess of its powers by requiring him to show he had expressed to Marten an interest in reemployment in a different capacity. Hill claims that this additional requirement is inconsistent with the purpose underlying § 102.35(3), STATS., and places an unfair burden upon the injured employee. We disagree.

The communication requirement must be placed in context. In the paragraph in which it imposes the requirement, LIRC first lists the four elements essential to the employee's *prima facie* case: (1) the claimant was an employee; (2) the employee sustained an injury on the job; (3) the employee applied for rehire; and (4) the employer refused to rehire because of the injury. *West Bend Co.*, 149 Wis. 2d at 126, 438 N.W.2d at 830-31. LIRC then states that no affirmative reapplication would be necessary when the employee is released by a physician to return to the same position without restrictions; informing the employer of the physician's release would be sufficient. LIRC also notes that no formal application is required where the employee has been terminated while on leave. *See L & H Wrecking Co. v. LIRC*, 114 Wis. 2d 504, 509-10, 339 N.W.2d 344, 347 (Ct. App. 1983). Finally, LIRC states that expressing to the employer the extent to which an employee is interested in working in a different capacity is neces-

111

sary when the employee is precluded from returning to his or her previous job.

From the context, we conclude that instead of adding to the employee's burden, LIRC was clarifying what "applying for rehire" entails in the case where an employee cannot resume his or her previous work. This clarification is in accord with *West Bend Co.* and *Universal Foods Corp. v. LIRC*, 161 Wis. 2d 1, 467 N.W.2d 793 (Ct. App.), *cert. denied*, 112 S. Ct. 332 (1991), in that the communication need not take the form of a written application, but may be accomplished through informal means, e.g., a telephone conversation. Furthermore, as a matter of common sense and logic, when an employee who cannot resume his previous position applies for rehire, he at the very least implies a willingness to accept work of a different nature. Therefore, we conclude that LIRC's application of the statute and corresponding case law is reasonable and must be affirmed.

Hill's argument that the employee now has the unfair burden of determining the specific positions for which he or she qualifies after the injury is unfounded. Nothing in LIRC's memorandum opinion suggests to us that the employee has to identify positions in which he or she would be interested by title or with great specificity. A statement by the employee that he or she would take any available job would obligate the employer to attempt to find a suitable position "within the employe's physical and mental limitations." Section 102.35(3), STATS.

## LIRC'S FINDINGS

Hill challenges LIRC's findings that he was not interested in working for Marten in another capacity,

and that he never expressed such an interest to Marten. He argues that the findings are contrary to his uncontroverted testimony that he spoke about office positions with Hayden, as well as undisputed evidence that the DVR had contacted Marten about the possibility of rehiring Hill for both office work and truck driving.

The fact that Hill phoned Hayden regularly for nearly a year after his permanent disabilities were determined does not necessarily prove that he discussed job openings with her. Hayden testified that Hill was required to contact Marten weekly while he received worker's compensation benefits. Moreover, even if his testimony about the content of his conversations with Hayden were uncontroverted, LIRC, as the finder of fact, was not obligated to find his testimony credible.

Similarly, the correspondence between the DVR and Marten provides no basis for disturbing LIRC's findings. The DVR contacted Marten in March and April 1987, long before Hill's healing period ended in November 1988. Furthermore, while the record reveals Marten's responses, it does not include copies of any letters sent to Marten or indicate precisely what inquiries the DVR made. That the DVR was simply exploring the possibilities for Hill's rehiring is one inference to be drawn from the evidence. Another would be that Hill was interested in both truck driving and office positions, and the DVR was relaying that interest. However, it is LIRC's task to choose between competing inferences, and we are bound by its choice.

The following evidence supports LIRC's findings: (1) Hill was enrolled in an electronics repair course at MATC when he allegedly made the first in a series of

inquiries about job openings in Marten's office; (2) Hill testified at the hearing that he was being trained in electronics so that his wages would be comparable to what he earned as a truck driver; and (3) the DVR's case notes indicate that Hill was concerned about moving to Mondovi to work in Marten's office because his wife would have to quit her job in Portage, and her employment opportunities in Mondovi were likely to be limited. Because this evidence exists in the record and is credible, we must affirm LIRC's findings that Hill neither was genuinely interested in other employment with Marten nor communicated such an interest.[3]

## DISTANCE BETWEEN CITIES

LIRC stated in its findings of fact that "Hill was reluctant to return to work with [Marten] in an office job since such jobs were in [Marten's] Mondovi, Wisconsin headquarters, which was too far from Hill's home in Portage, Wisconsin, to allow commuting." In a footnote to this statement, LIRC took notice from a Department of Transportation map that the distance between the two communities is at least 130 miles. Hill argues that § 102.18(3), STATS., precluded LIRC from considering such evidence because it was not submitted to the ALJ, and Hill was not permitted to present rebuttal evidence. We conclude that we need not resolve the issue.

The DVR's case notes indicate that Hill said he would have to relocate to Mondovi if he were to take an office position. This evidence by itself would support

---

[3] We do not mean to imply by our conclusion that an employee must demonstrate a "genuine interest" in reemployment in another capacity as part of his or her *prima facie* case. The obligation which LIRC imposed, and we uphold, is that the employee affirmatively express the extent of his or her interest in employment in another capacity.

114

LIRC's finding that Hill was unwilling to commute between the two locations. Thus, even if it were error for LIRC to take notice of the distance between the two municipalities, we could not conclude that it warranted reversal of LIRC's order.

*By the Court.*—Order affirmed.

SUNDBY, J. (*dissenting*). The Labor and Industry Review Commission incorrectly framed this case under § 102.35(3), STATS.,[1] as a voluntary quit by the employee. The evidence is undisputed that the employee, Ronald Hill, did not voluntarily terminate his employment. On February 22, 1990, Marten's driver manager addressed the following letter to Hill: "Your employment with Marten Transport, Ltd., has been terminated as of 2-21-90 *because you are no longer able to perform your duties as a truck driver.*" (Emphasis added.) It would have been unnecessary for Marten to terminate Hill's employment if he had already voluntarily quit. The issue which LIRC should have decided was whether Hill's inability to perform his job because of his injury was "reasonable cause" for Marten to refuse to "rehire" Hill.

On two other occasions during Hill's disability layoff, Marten refused to "rehire" Hill. On March 30, 1987, Marten's director of safety and loss control informed Hill's rehabilitation counselor by letter: "At this point

---

[1] Section 102.35(3), STATS., provides in part:

Any employer who without reasonable cause refuses to rehire an employe who is injured in the course of employment, where suitable employment is available within the employe's physical and mental limitations, upon order of the department and in addition to other benefits, has exclusive liability to pay to the employe the wages lost during the period of such refusal, not exceeding one year's wages.

. . . I am unable to give you a definitive answer [to whether Hill is eligible for rehire by Marten]." On January 13, 1989, Marten's director of risk management wrote Hill: "On this date, we discussed the possibility of you returning to work at Marten Transport, Ltd. Due to the fact that you are no longer able to operate a tractor/trailer vehicle, Marten Transport, Ltd., does not have a position available for you." Marten left open the possibility that Hill could apply "for any position open in the same manner as any other applicant . . . ." Thus, Marten treated Hill as any person applying for a position with the company. Under § 102.35(3), STATS., Marten had a greater obligation to Hill than to treat him as a non-employee.

LIRC's failure to recognize Marten's duty to Hill may arise because case law does not adequately define "rehire" as used in § 102.35(3), STATS. I conclude that the word "rehire" includes the case where an injured employee is turned away by the employer without reasonable cause when the employee seeks to return to his or her employment. We adopted that construction in *Link Indus., Inc. v. LIRC*, 141 Wis. 2d 551, 556, 415 N.W.2d 574, 576-77 (Ct. App. 1987), where we said:

> We conclude that "rehire" under § 102.35(3) means that if an employee is absent from work because of an injury suffered in the course of employment, the employee must be allowed the opportunity to return to work if there are positions available and the previously injured employee can do the work.

We have also held that "to require a *terminated* employee to report to work in order to recover under sec. 102.35(3), Stats., is an unreasonable construction of the statute." *L & H Wrecking Co. v. LIRC*, 114 Wis. 2d 504, 510, 339 N.W.2d 344, 347 (Ct. App. 1983).

Thus, where an injured employee has been terminated, we have held that it is not part of the employee's *prima facie* case to apply for "rehire." *See id.* Therefore, Hill was not required to apply to Marten for re-employment after Marten terminated him as of February 21, 1990.

Unfortunately, the *Link* construction of "rehire" does not correspond with the construction given the word by the Wisconsin Supreme Court. In *West Bend Co. v. LIRC*, 149 Wis. 2d 110, 119, 438 N.W.2d 823, 828 (1989), the court said: "The statute refers to one who is not an employe but seeks to become one under sec. 102.35(3), on the basis of a *prior* employment status that existed when an injury occurred."

I conclude, however, that our construction of "rehire" can be reconciled with the supreme court's definition. The issue in *West Bend* was whether an injured employee who was laid off as part of a general seasonal plant layoff could assert a claim under § 102.35(3), STATS. The employer argued that the claimant had to be an employee when she attempted to return to work. The supreme court concluded that she did not; it said that under the statute, "the focus is on the injury, the employment status at the time of injury, the fact of being out of work, and the failure to rehire in the absence of reasonable cause." *Id.* at 122, 438 N.W.2d at 829. The supreme court's statement that § 102.35(3) refers to one who is not an employee but seeks to become one may be limited to the fact situation then before the court.

The legislative history of § 102.35(3), STATS., supports our construction of the word "rehire." The minutes of the Workmen's Compensation Advisory Council meeting of January 21, 1975, show that the council considered a proposal "prohibiting employers from terminating injured employes where there was

suitable employment available within their physical limitations . . . ." Thus, the focus of the proposal which eventually became § 102.35(3) was not former employees but *present* employees. I conclude that § 102.35(3) provides a remedy to the injured employee who is not formally terminated but is turned away when he or she seeks to return to his or her employment, as well as to the employee whose employment is terminated because of the employee's injury.

Another way of reconciling the *West Bend* language with our definition of "rehire" is to conclude that § 102.35(3), STATS., provides a remedy to an employee who has been constructively discharged by the employer's refusal to allow the employee to return to his or her employment.

Accepting this court's definition of "rehire," the inquiry becomes: What is the "period of such refusal" under § 102.35(3), STATS., referring to the employer's refusal to "rehire" an employee injured in the course of employment? In this case, the administrative law judge concluded that the employer violated § 102.35(3) as of February 21, 1990, when Marten formally terminated Hill. The ALJ apparently concluded that the "period of refusal" began on the date Marten formally terminated Hill and extended to the date of the ALJ's order entered April 2, 1991. This construction seems incorrect; it allows the employer to escape liability for an extended period of refusal to rehire prior to formally terminating the employee's employment. I conclude that the period of refusal begins when the employee informs the employer that he or she is ready to return to employment and is turned away by the employer. The burden is then on the employer to justify its refusal to rehire by showing that it has no job available that the employee is physically or mentally capable of per-

forming. *West Bend*, 149 Wis. 2d at 123, 438 N.W.2d at 829. Marten erroneously assumed that "reasonable cause" to not rehire Hill existed simply because Hill could no longer operate a tractor/trailer. Marten made no effort to employ Hill in any other capacity and treated Hill as any other applicant for employment.

Of course, an employer has no duty to an injured employee who voluntarily quits. The *West Bend* court made clear that that case did not present the question whether an employee who voluntarily quits waives the right under § 102.35(3), STATS., to be rehired. *Id.* Nor does this case present that question. Not until Hill began this proceeding did Marten claim that Hill had voluntarily terminated his employment. Marten believed that it was necessary that it terminate Hill's employment and it did so on February 21, 1990.

I would direct the circuit court to remand this case to LIRC to determine whether the reason given by Marten for terminating Hill constituted "reasonable cause." I would not permit Marten to defend on the grounds that Hill voluntarily terminated his employment. I would, however, allow Marten to show that during the period of refusal no suitable employment was available that Hill could perform.

If I must accept the issue in this case as framed by LIRC, I conclude that LIRC's decision is not supported by credible evidence. The administrative law judge found that "[t]here is abundant evidence to indicate that [Hill] made numerous contacts to [Marten] regarding work." Despite the fact that LIRC did not hear or observe the witnesses, LIRC overruled the ALJ's determination of the credibility of the witnesses. LIRC found as follows:

> The Commission finds as a matter of fact, based upon its assessment of the credibility of Hill and

Hayden, that at the time of their telephone calls in December 1988 and following months Hill did not have any genuine interest in returning to work with [Marten] in an office position, and that he did not express or indicate any such interest. Hill was not considered for any openings that may have existed in positions of payroll clerk, dispatcher, or risk manager, subsequent to November 18, 1988, because he had not made known to [Marten] that he was interested in any such jobs.

"Hayden" refers to Debra Hayden who started as an administrative assistant for Marten and became its risk manager. It is undisputed that she was the person Hill was to contact regarding employment. The ALJ summarized her testimony as follows: "Can't dispute [Hill's] testimony." Hill had testified that he regularly contacted Marten seeking to return to Marten in some capacity. Hayden was asked the following questions and gave the following answers:

Q.  Do you have any information to dispute [Hill's] testimony regarding how many times he called you?

A.  No, sir.

Q.  Mr. Hill testified that he called you, and on many phone calls said that he would take any work; do you have any reason to dispute that?

A.  Yes, because I do not recall him stating that, I do not recall him stating that he would take any position.

. . . .

Q.  I'm not asking generally; I'm asking what Mr. Hill said?

120

A. I don't know.

Q. How can you dispute what he says if you don't have any idea what he said?

A. I don't have any documentation notes that are written.

. . . .

Q. Do you have any recollection at all of anything that you and Mr. Hill talked about?

A. Yes, . . . we did discuss that he wanted retraining, . . . it's possible we discussed a position at Marten, . . . and it would have been taken to whoever might have had a position in the company, and in there was nothing available, there was nothing available at the time.

Hayden's testimony was correctly summarized by the ALJ; she was unable to dispute Hill's testimony. LIRC's reliance on Hayden's testimony is misplaced.

LIRC concluded it was not enough that Hill showed that he informed Marten that he wished to be placed in a position with Marten. LIRC imposed on Hill the burden of showing that suitable employment existed which he was physically and mentally capable of performing and that he applied for such employment. LIRC acknowledged that if an employer learns that an injured employee has been released to return to his or her old job, "the employer can reasonably be expected to take the initiative to offer reemployment." But the commission added:

> However, where an employe is released by his physician after an extended period of total disability with significant permanent restrictions that all parties agree will preclude the employe from returning to the type of work he always did for the

employer, it is appropriate to impose on the employe some type of obligation of communicating to the employer the extent of his interests, if any, in returning to employment with that employer in a *different* capacity.

Thus, in the guise of statutory construction of § 102.35(3), STATS., LIRC imposed a substantive requirement on an injured employee which is not authorized by § 102.35(3). LIRC "may not promulgate rules except that it may promulgate its rules of procedure." Section 101.04(2), STATS. Adding a substantive requirement to § 102.35(3) is not one of LIRC's "rules of procedure."

By this requirement LIRC has shifted to the injured employee the burden of determining whether suitable employment exists and of applying for that employment. In *L & H Wrecking Co.*, we said: "It is unreasonable to shift onto the employee, especially a terminated employee, the burden of proving the availability of suitable jobs when this information is easily accessible to the employer through company business records." *L & H Wrecking Co.*, 114 Wis. 2d at 510-11, 339 N.W.2d at 347-48. Once the employee has established a *prima facie* case, the burden shifts to the employer to show that no suitable work is available which the employee could perform. *Universal Foods Corp. v. LIRC*, 161 Wis. 2d 1, 6-7, 467 N.W.2d 793, 795 (Ct. App. 1991), *cert. denied*, 112 S. Ct. 332 (1991). *West Allis Sch. Dist. v. DILHR*, 116 Wis. 2d 410, 425-26, 342 N.W.2d 415, 423-24 (1984) demonstrates that it is not part of the employee's *prima facie* case to show that he or she has identified and applied for suitable employment within the employee's capabilities.

Thus, accepting this case as framed by LIRC, its decision cannot be sustained. For these additional reasons, I dissent.