WISCONSIN BELL, INC., Petitioner-Appellant,†

v.

LABOR AND INDUSTRY REVIEW COMMISSION and
Charles E. Carlson, Respondents-Respondents.

Court of Appeals

*No. 2016AP355. Submitted on briefs December 8, 2016.*
*—Decided March 28, 2017.*

2017 WI App 24

(Also reported in 895 N.W.2d 57.)

† Petition for Review filed.

294

On behalf of the petitioner-appellant, the cause was submitted on the brief of *Laura A. Linder* and *Julia S. Arnold* of *Littler Mendelson, P.C.* of Milwaukee.

On behalf of the respondents-respondents, the cause was submitted on the briefs of *Brad D. Schimel*, Wisconsin Attorney General, *Jennifer L. Vandermeuse*, Assistant Attorney General, and *Robert M. Mihelich* of the *Law Offices of Robert M. Mihelich* of New Berlin.

Before Brennan, P.J., Kessler and Brash, JJ.

¶ 1. BRASH, J. Wisconsin Bell, Inc., appeals an order of the circuit court remanding the decision of the Labor and Industry Review Commission (LIRC) based on the sufficiency of the evidence. Respondent Charles E. Carlson filed two disability discrimination claims against his former employer, Wisconsin Bell,[1] alleging that Wisconsin Bell had suspended him without pay in 2010 and subsequently terminated his employment in 2011 because of his disability, bipolar disorder, in violation of the Wisconsin Fair Employment Act (WFEA). *See generally* WIS. STAT. § 111.31.[2] LIRC found

---

[1] Throughout the record in this matter, Wisconsin Bell is sometimes referred to as AT&T; they appear to be used interchangeably, and for our purposes we assume they are.

[2] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted. Because the appli-

that Wisconsin Bell had not violated the WFEA with regard to Mr. Carlson's suspension, but determined that there was a violation with regard to Mr. Carlson's termination.

¶ 2. Wisconsin Bell then filed a petition for judicial review of LIRC's decision with the Milwaukee County Circuit Court. The circuit court found LIRC's analysis of the issues and facts of the case to be "incomplete" and remanded it to LIRC to further analyze and weigh the evidence.

¶ 3. Wisconsin Bell now appeals that decision, arguing that LIRC's theory of causation, referred to as the "inference method," is not a reasonable interpretation of the WFEA, and thus LIRC's decision should be reversed. In the alternative, if the inference method is found by this court to be reasonable, Wisconsin Bell asserts that LIRC's decision should be reversed as a matter of law because there is insufficient evidence to support the imposition of liability using that method.

¶ 4. We disagree with Wisconsin Bell. Upon review, we find the inference method of causation to be a reasonable interpretation of the WFEA by LIRC, and further, that the evidence in the record is sufficient to support LIRC's findings and decision. We therefore reverse the circuit court, and affirm LIRC.

## BACKGROUND

¶ 5. Mr. Carlson was a long-time employee of Wisconsin Bell, having been hired on March 4, 1986. During the tenure of his employment he worked in a number of different areas of the company, most recently as a customer service representative, holding

cable statutes have not changed in the seven years this case was pending, we refer to the 2015–16 version.

this position since November 2007. For this position, Mr. Carlson worked at the Tier II Call Center, providing technical support to Wisconsin Bell's customers and technicians for AT&T U-verse services by answering incoming phone calls and responding to electronic messages.

¶ 6. Mr. Carlson began treatment in 1997 for what was eventually diagnosed as bipolar I disorder by his psychiatrist, Dr. Mark Siegel. This illness is characterized by having at least one episode of mania, combined with episodes of depression. These "extreme moods" can come on rather quickly; for example, a "relatively minor frustration" can trigger an episode. Mr. Carlson's condition is treated by both medication prescribed by Dr. Siegel and by therapy with his psychotherapist, Edward Cohen.

¶ 7. In 2006, prior to moving to the Tier II Call Center, Mr. Carlson disclosed his condition to his supervisor at the time, John Reichertz. Under Wisconsin Bell's policy, Mr. Reichertz could, at his discretion, allow temporary accommodations for limited periods of time for Mr. Carlson when his symptoms arose at work. These accommodations included time spent offline from taking calls, talking with Mr. Reichertz in a conference room, and the opportunity to call his therapist. When Mr. Carlson could not get his symptoms under control and had to leave work, he sometimes requested that the time off be covered under the Family and Medical Leave Act (FMLA).

¶ 8. Additionally, Mr. Carlson took medical leaves from Wisconsin Bell using FMLA on several occasions due to his condition, in 2008 and 2009. These requests were made to a separate entity, the AT&T Integrated Disability Service Center (IDSC), which is utilized by Wisconsin Bell for short-term or long-term

disability claims, including the review of requested accommodations for disabilities. Any health information received by the IDSC about employees remains confidential.

¶ 9. Mr. Carlson also informed his next supervisor, Michaela Wirtz, about his condition. However, at the time of his disclosure, Ms. Wirtz told Mr. Carlson that Mr. Reichertz had already informed her about it. When Mr. Carlson moved to his most recent position at the Tier II Call Center, however, he did not inform his new supervisor about his condition because he thought this information was passed on by management.

¶ 10. In 2010, Mr. Carlson was disciplined after he was observed violating company policy. On February 18, 2010, Jason Carl, the area manager for the Tier II Call Center, and Jeanette Weber, an operations manager, observed Mr. Carlson disconnect eight consecutive calls over a period of nine minutes, without explanation, in violation of Wisconsin Bell's policy that prohibits call avoidance. As a result of this policy violation, Mr. Carlson was issued a suspension pending termination.

¶ 11. Subsequently, a Review Board hearing was held on March 4, 2010, with regard to Mr. Carlson's disciplinary action. Mr. Carl and Peggy Texeira, the AT&T Labor Relations Manager at that time, were present at that hearing, representing management. During this hearing, Mr. Carlson presented letters from Dr. Siegel and Mr. Cohen describing his illness and its symptoms, such as "extreme moods" that can come on rather quickly, triggered by a "relatively minor frustration." Prior to this, Mr. Carl had not been informed about Mr. Carlson's condition. Nevertheless, Mr. Carl found that the letters had no impact on the proceeding because the conduct for which Mr. Carlson

303

was being disciplined, intentionally disconnecting customers, would never be allowed under any circumstances.

¶ 12. Ultimately, Wisconsin Bell imposed a fifty-day unpaid suspension on Mr. Carlson instead of terminating him. Mr. Carlson was told by Ms. Texeira that if he needed an accommodation for his condition in the future, that he should request it through IDSC. He was also informed that Wisconsin Bell would not permit an accommodation that involved call avoidance in the workplace.

¶ 13. To that end, Wisconsin Bell required Mr. Carlson to enter into a "Back to Work Agreement," which permits an employee to return to work with the understanding that at any time during a one-year time frame, Wisconsin Bell would have just cause to terminate that employee for any infractions relating to customer care, or for a breach of integrity. The enforcement of the Back to Work Agreement commenced when Mr. Carlson returned to work after his suspension on May 1, 2010, and was to continue through April 30, 2011.

¶ 14. Ten days prior to the expiration date of the Back to Work Agreement, on April 20, 2011, Mr. Carlson left work just before lunch due to illness. Prior to leaving, around 11:00 am, he had activated a "health code." During the workday an employee may activate a health code which takes that employee temporarily offline and keeps him or her from receiving any incoming customer calls, for a variety of reasons, from illness to simply needing to use the restroom. There are no written rules relating to the time limit of a health code; however, the average health code is three to five minutes.

¶ 15. Around 11:15 am, while his health code was still active, Mr. Carlson spoke to his direct supervisor at the time, Kristi Reidy, about leaving work for the day due to illness. He returned to his desk, eventually notifying the help desk that he was leaving due to illness, in accordance with Wisconsin Bell's internal procedures. He then left work at 11:50 am. He did not submit a request for FMLA leave for this absence.

¶ 16. The total time Mr. Carlson's health code was activated that day was thirty-eight minutes. During this time, he was questioned about the excessive length of the health code by an operations manager, LaDonna Sneed-Brown, by means of "Q-Chat," Wisconsin Bell's computerized inter-office communication system. Mr. Carlson replied to Ms. Sneed-Brown that he was going to leave work due to illness. However, he then sent another Q-Chat to Ms. Sneed-Brown that said "TTYL. Thank you. Talk to you later and thanks for being there as one of my lesbian friends." When Ms. Sneed-Brown responded with a question as to the nature of his message, Mr. Carlson replied "[s]orry wrong window."

¶ 17. Suspecting that Mr. Carlson had been engaged in Q-Chatting about personal matters with other employees during the time he had activated the health code, Ms. Sneed-Brown reported Mr. Carlson's health code and message to Ms. Reidy. They reviewed a number of Q-Chats showing that Mr. Carlson had indeed initiated Q-Chats with coworkers during that time, discussing the fact that he had failed a test that was required in order to transfer to the Collections Department and was having a hard time being "customer friendly and perky." He had also "chatted" with his union representative regarding how his absence would be documented if he were to leave work early.

305

¶ 18. Based on the tone and content of the Q-Chats, Ms. Reidy and Ms. Sneed-Brown concluded that Mr. Carlson was not really ill, and had merely been "chitchatting" about personal matters and engaging in "gossip" with his coworkers during the time his health code was activated. They reported their findings to Mr. Carl. The next day, on April 21, 2011, Mr. Carlson received a notice of suspension pending termination.

¶ 19. A Review Board hearing for this incident was held on May 26, 2011. Mr. Carlson obtained another letter from Dr. Siegel regarding his bipolar disorder, noting that his medication had been increased recently as a result of an increase in his depression. This letter was dismissed by Mr. Carl, who stated, "[w]e've seen this before." Mr. Carlson explained that he had put himself into the health code on April 20, 2011, after he learned that he had failed the test for the Collections Department, which had greatly upset him, and he "doesn't react to things like everybody else."

¶ 20. Mr. Carlson stated that he then went to see Ms. Reidy about leaving for the day, and she told him to "do what you need to do." He further explained that after speaking to Ms. Reidy, he had returned to his desk, as he was going to try to continue working since the call center was in a "Code Red" that day, meaning there were very heavy call volumes. He explained that he had been Q-Chatting with other employees who were friends of his for support, as had been suggested by his therapist. He did this until he was questioned by Ms. Sneed-Brown. He ultimately decided to leave work for the day because he was crying and "would not be able to handle calls and be professional" with customers.

¶ 21. After the Review Board hearing, Wisconsin Bell determined that Mr. Carlson's termination was warranted. In a letter dated June 7, 2011, Wisconsin Bell described what it determined were breaches of the provisions of the Back to Work Agreement, namely the mistreatment of customers by Q-Chatting with other employees while having activated a health code for an excessive amount of time, and a breach of integrity in leaving work early because it did not believe that he was truly ill. In sum, Wisconsin Bell stated that Mr. Carlson was terminated due to his "continued and repeated behavior of avoiding customer calls[.]"

¶ 22. Mr. Carlson filed two complaints with the Wisconsin Department of Workforce Development—Equal Rights Division (ERD), the first in June 2010 after he received the fifty-day suspension, and the second in February 2012, subsequent to his termination. In those complaints, which were consolidated for the hearing before Administrative Law Judge James A. Schacht (ALJ), Mr. Carlson alleged that Wisconsin Bell had violated the WFEA in taking these actions because they were based on his disability, and further, that Wisconsin Bell had refused to reasonably accommodate his disability.

¶ 23. In a decision dated April 24, 2014, the ALJ determined that Mr. Carlson's conduct was caused by his condition, and thus both actions taken by Wisconsin Bell against Mr. Carlson, the suspension and the termination, were "because of" his disability. Therefore, Wisconsin Bell had violated the WFEA with regard to both the suspension and the termination of Mr. Carlson. The ALJ ruled that Mr. Carlson was to be reinstated at Wisconsin Bell, with back pay, and with Wisconsin Bell making reasonable accommodations for

his disability. The ALJ further stated that Wisconsin Bell was to pay Mr. Carlson's attorney's fees and costs.

¶ 24. Wisconsin Bell timely appealed the decision to LIRC. LIRC, in a decision dated February 19, 2015, reversed the ALJ's ruling regarding the suspension, finding that although Mr. Carlson's conduct in February 2010 was caused by his bipolar disorder, his supervisor and managers at that time did not have knowledge of his disability.

¶ 25. However, LIRC affirmed the determination that Wisconsin Bell had terminated Mr. Carlson because of his disability. It found that Mr. Carlson's conduct in April 2011 was again caused by his bipolar disorder, but at that point in time his supervisor and managers had been informed of his condition and the types of symptoms which could arise at work. Thus, LIRC found that Wisconsin Bell had violated the WFEA, and affirmed that Mr. Carlson was to be reinstated with back pay, with Wisconsin Bell paying his attorney's fees and costs.

¶ 26. Wisconsin Bell then filed a petition for judicial review of LIRC's decision with the Milwaukee County Circuit Court. The circuit court found that the inference theory of causation utilized by LIRC in finding Wisconsin Bell liable was reasonable. However, the circuit court remanded the case to LIRC, finding LIRC's analysis of the issues and facts of the case to be "incomplete," specifically with regard to LIRC's findings relating to whether Wisconsin Bell had known that Mr. Carlson's conduct was caused by his condition at the time of his termination.

¶ 27. Wisconsin Bell now appeals to this court, arguing that the inference method of establishing causation is not a reasonable interpretation of the WFEA; or, in the event that it is found to be reasonable

and applied in this case, that the evidence is not sufficient to support a finding of liability on the part of Wisconsin Bell.

¶ 28. Judicial review of a decision by an administrative agency requires that this court review the decision of the agency, not the circuit court. *Hill v. LIRC*, 184 Wis. 2d 101, 109, 516 N.W.2d 441 (Ct. App. 1994). Our scope of review is the same as that of the circuit court. *Id.* However, when an agency decision is appealed to the court of appeals from an order of the circuit court, "the question presented is whether the circuit court erred in its determination," and, as such, "this court in the exercise of its appellate jurisdiction does not reverse or modify the order of the commission. It deals with the order of the circuit court." *Clintonville Transfer Line v. PSC*, 248 Wis. 59, 76–77, 21 N.W.2d 5 (1945).

¶ 29. The findings of fact determined by an agency are reviewed by this court using the "substantial evidence" standard. *Milwaukee Symphony Orchestra, Inc. v. DOR*, 2010 WI 33, ¶ 31, 324 Wis. 2d 68, 781 N.W.2d 674. Substantial evidence does not denote a preponderance of evidence; rather, the court determines, after considering all of the evidence in the record, whether "reasonable minds could arrive at the conclusion reached by the trier of fact." *Id.* ' "[T]he weight and credibility of the evidence are for the agency, not the reviewing court, to determine." ' *Id.* (citation omitted). To that end, the findings of fact "may be set aside only when a reasonable trier of fact

could not have reached them from all the evidence before it, including the available inferences from that evidence." *Id.*

¶ 30. The application of those factual findings to the statute at issue, on the other hand, is a question of law. *ITW Deltar v. LIRC*, 226 Wis. 2d 11, 16, 593 N.W.2d 908 (Ct. App. 1999). The courts may, however, defer to the agency's interpretation and application of the statute, applying one of the three levels of deference to the agency's decision: great weight deference, due weight deference, or no deference. *Racine Harley-Davidson, Inc. v. DHA*, 2006 WI 86, ¶ 12, 292 Wis. 2d 549, 717 N.W.2d 184.

¶ 31. Great weight deference is given when the following requirements are met:

> (1) the agency is charged by the legislature with the duty of administering the statute; (2) the agency interpretation is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Id.* at ¶ 16. Due weight is given when the agency "has some experience in an area but has not developed the expertise that necessarily places it in a better position than a court to make judgments regarding the interpretation of the statute." *Id.* at ¶ 18. The agency is afforded no deference under any of the following circumstances: "(1) the issue is one of first impression; (2) the agency has no experience or expertise in deciding the legal issue presented; or (3) the agency's

position on the issue has been so inconsistent as to provide no real guidance." *Id.* at ¶ 19.

¶ 32. The WFEA prohibits an employer from discriminating against an individual based on that person's disability. WIS. STAT. § 111.321. There are three factors that must be met in order to establish that a violation of the WFEA has occurred, and to impose liability on an employer. First, the employee must be an individual with a disability. The definition of "disability" under the statute includes a "mental impairment which makes achievement unusually difficult or limits the capacity to work." WIS. STAT. § 111.32(8)(a). Next, there has to have been an adverse action, such as termination, taken by the employer against the employee *because of* the employee's disability. WIS. STAT. § 111.322(1) (emphasis added). The third factor addresses whether the employer is able to show that the adverse action was warranted. WIS. STAT. § 111.34.

¶ 33. There is no dispute that Mr. Carlson has a disability under the first factor of the statute. It is also undisputed that Mr. Carlson was terminated by Wisconsin Bell. Instead, the issues on appeal address whether LIRC's interpretation of the WFEA is reasonable, specifically with regard to the "because of" language in the statute, whereby LIRC applies the inference theory of causation to impose liability on employers. Additionally, the parties disagree on the level of deference that we should apply to LIRC's decision, a threshold question that is intertwined with LIRC's use of the inference theory of causation in

311

finding that employers have violated the WFEA. We conclude that LIRC should be accorded great weight deference in this matter.

¶ 34. LIRC has interpreted the "because of" language set forth in Wis. Stat. § 111.322(1) as delineating two types of discrimination by employers: (1) that which occurs "in the form of an employer acting on the basis of actual discriminatory animus against an employee because that employee was an individual with a disability," and (2) that which occurs "from the employer acting on the basis of dissatisfaction with a problem with that employee's behavior or performance which is caused by the employee's disability." *Maeder v. Univ. of Wisconsin-Madison,* ERD Case No. CR200501824, at *2 (LIRC, June 28, 2013). Under this second type of discrimination, causation is inferred based on the premise that "[i]f an employee is discharged because of unsatisfactory behavior which was a direct result of a disability, the discharge is, in legal effect, because of that disability." *Id.* In other words, the focus of the analysis for the inference method of causation is whether the disability was the cause of the unsatisfactory conduct that led to the discharge.

¶ 35. LIRC concluded that Wisconsin Bell had violated WFEA based on this second type of discrimination where causation is inferred; that is, in terminating Mr. Carlson due to his conduct on April 20, 2011, which LIRC found was caused by his bipolar condition, Wisconsin Bell terminated Mr. Carlson because of his disability, in violation of the WFEA. Wisconsin Bell asserts that this theory of causation is questionable at best, citing *Wal-Mart Stores, Inc. v. LIRC,* 2000 WI App 272, 240 Wis. 2d 209, 621 N.W.2d 633. We disagree.

¶ 36. In the first place, the issue decided by this court in *Wal-Mart* was not the reasonableness of the inference theory of causation, but rather one of the sufficiency of the evidence in the record to establish such causation. *Id.* at ¶ 25. Still, the *Wal-Mart* court also indicated that the inference method of determining causation "involves significant policy implications" and, as such, "invited" LIRC to "expand on the rationale for its adoption" of that interpretation of the WFEA. *Id.* at ¶ 28.

¶ 37. However, subsequently in *Stoughton Trailers, Inc. v. LIRC*, 2007 WI 105, ¶ 32, 303 Wis. 2d 514, 735 N.W.2d 477, the Wisconsin Supreme Court recognized that LIRC has "acquired much experience interpreting 'because of' disability language in the WFEA [and] is well acquainted with the policies that underlie the disability protections of the WFEA." That court ultimately applied due weight deference to its causation analysis, agreeing with this court on this issue based on LIRC's concession that "it took a somewhat different approach here than in previous cases addressing somewhat similar issues." *Stoughton Trailers, Inc. v. LIRC*, 2006 WI App 157, ¶ 21, 295 Wis. 2d 750, 721 N.W.2d 102, *aff'd*, 2007 WI 105, ¶ 21, 303 Wis. 2d 514, 735 N.W.2d 477. That is not the case here.

¶ 38. As Wisconsin Bell points out, this issue has not since been reviewed in the Wisconsin courts. Yet, the inference method of causation, as stated in *Maeder*, has been applied by LIRC to numerous cases that have simply not been appealed any further. *See Crivello v. Target Stores*, ERD Case No. 9252123 (LIRC, Aug. 14, 1996), *aff'd, Target Stores v. LIRC*, 217 Wis. 2d 1, 576 N.W.2d 545 (Ct. App. 1998), in which the employee's falling asleep on the job was attributable to her sleep apnea; *Staats v. Counties of Sawyer and Bayfield*, ERD

313

Case No. 9500906 (LIRC, Oct. 27, 1997), in which the employee's many inappropriate acts were attributable to his bipolar disorder; *Stroik v. Worzalla Publishing Co.*, ERD Case No. CR200002461 (LIRC, July 16, 2004), in which the employee's poor attendance was attributable to his diabetes; *Stelloh v. Wauwatosa Savings Bank*, ERD Case No. CR200700340 (LIRC, June 19, 2012), in which the employee's attendance problems and poor customer service were attributable to her migraine headaches.

¶ 39. In fact, a "lack of published precedent does not indicate that this is an issue of first impression or very nearly an issue of first impression for LIRC." *Klatt v. LIRC*, 2003 WI App 197, ¶ 14, 266 Wis. 2d 1038, 669 N.W.2d 752. Additionally, it is not necessary for LIRC to have previously ruled on the application of a statute with regard to "a factual situation exactly similar to the one presented if LIRC otherwise has extensive experience in administering the statutory scheme in a variety of situations." *Id.* Therefore, we reject Wisconsin Bell's contention that this is an issue of first impression that does not require any deference to be granted to LIRC's decision.

¶ 40. Instead, as previously stated, we conclude that LIRC meets all of the criteria required, as described above, to grant it great weight deference: (1) LIRC has been charged by the legislature with the duty of administering the WFEA since its enactment; (2) LIRC's interpretation of the WFEA is one of long standing; (3) LIRC employed its expertise or specialized knowledge in forming its interpretation; and (4) LIRC's interpretation will provide uniformity and

314

consistency in the application of the WFEA. *See Target Stores v. LIRC*, 217 Wis. 2d 1, 13, 576 N.W.2d 545 (Ct. App. 1998).

¶ 41. Furthermore, in determining that LIRC's interpretation of the statute in applying the inferred causation theory of liability is long-standing and utilizes its expertise and specialized knowledge, we find it to be a reasonable interpretation of the WFEA.

¶ 42. The interpretation of a statute is unreasonable "if it directly contravenes the words of the statute, it is clearly contrary to legislative intent or it is without rational basis." *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995). "The burden of proof to show that the agency's interpretation is unreasonable is on the party seeking to overturn the agency action; it is not on the agency to justify its interpretation." *Id.* at 661.

¶ 43. Wisconsin Bell has not shown that LIRC's interpretation is unreasonable. In addition to citing *Wal-Mart* as opposition for this interpretation, as discussed above, Wisconsin Bell also cites two federal cases which reviewed issues relating to the Americans with Disabilities Act (the ADA). We do not find these cases to be particularly helpful in this analysis. In the first place, "[t]hough this court may look to federal law for guidance" in analyzing the reasonableness of LIRC's interpretation of the WFEA, "we are not bound by those cases." *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶ 46, 264 Wis. 2d 200, 664 N.W.2d 651. Rather, we recognize that Wisconsin has "established its own scheme for dealing with employment discrimination" based on disability and, as such, we interpret the WFEA "in accordance with [the Wisconsin] legis-

lature's intention rather than with the intention of other jurisdictions." *Id.* (quoting *McMullen v. LIRC*, 148 Wis. 2d 270, 275–76, 434 N.W.2d 830 (Ct. App. 1988)).

¶ 44. Moreover, the Seventh Circuit cases cited by Wisconsin Bell are not on point with this case. For example, in *Spath v. Hayes Wheels International-Indiana, Inc.*, 211 F.3d 392, 394–95 (7th Cir. 2000), an employee with epilepsy was terminated after lying about an injury that was not related to his disability or even actually work-related. Therefore, the court found that he had "failed to establish a prima facie case of disability discrimination." *Id.* at 399. The other case, *Palmer v. Circuit Court of Cook County, Illinois*, 117 F.3d 351, 352 (7th Cir. 1997), addressed the termination of an employee with no previous history of mental illness but who claimed to have one when she threatened to kill her supervisor. The court held that "[t]he Act protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one." *Id.* Neither of these cases provides new theories or compelling arguments for finding that LIRC's use of the inferred causation theory is not reasonable.

¶ 45. "Once it is determined . . . that great weight deference is appropriate, we have repeatedly held that an agency's interpretation must then merely be reasonable for it to be sustained." *Harnischfeger*, 196 Wis. 2d at 661. We find that the theory behind the inference method of causation—determining the intent of the employer by inference, based on the circumstances surrounding the employer's action—is a reasonable interpretation of the WFEA as a means of imposing liability on an employer.

316

¶ 46. Nevertheless, the application of the inference method of causation requires evidence that the employer had knowledge of the link between the employee's disability and the conduct that resulted in the adverse action of the employer. *Maeder,* ERD Case No. CR200501824, at \*2.

¶ 47. Wisconsin Bell asserts that there is not sufficient evidence to support the findings that Wisconsin Bell had knowledge of Mr. Carlson's disability, or that his disability was behind the motivation for terminating him. In support of its assertion, Wisconsin Bell cites several LIRC decisions, although most of the cases cited discuss issues that are markedly dissimilar and not relevant in this analysis. *See, e.g., Polesky v. United Brake Parts,* ERD Case No. 9250821 (LIRC, August 30, 1996) (where the complainant's disability was not diagnosed until after the adverse action by the employer); *Greco v. Snap-On Tools,* ERD Case No. 200200350 (LIRC, May 27, 2004) (where the complainant failed to establish that his alleged disability was a permanent condition); and *DeMoya v. WDVA,* ERD Case No. CR201104078 (LIRC, December 12, 2013) (where the complainant was a state legislative officer and not an employee of the VA).

¶ 48. However, the facts and issues in *Cook v. Community Care Resources, Inc.,* ERD Case No. 199903790 (LIRC, January 13, 2003) provide some pertinent insight. In *Cook,* the complainant became severely ill shortly after taking a job with Community Care Resources. *Id.* at \*1. Her resulting diagnosis qualified as a disability, and she requested an indefinite medical leave of absence. *Id.* The request was denied and she was ultimately terminated. *Id.* at \*2. LIRC found that the termination was not due to

discrimination, but rather due to inadequate job performance that was noted prior to the complainant's medical diagnosis; therefore, the employer had not violated the WFEA. *Id.* at *5–6.

¶ 49. Since LIRC held in *Cook* that the complainant's termination was not made because of her disability, the inquiry ended there. Specifically, LIRC noted that there was sufficient evidence of job performance issues warranting Cook's termination that had occurred before her diagnosis and thus prior to her employer having any knowledge of her disability. *Id.* at *4.

¶ 50. Despite the different outcome, that same line of reasoning was applied by LIRC in this case. LIRC found that with regard to the incident in February 2010 when Mr. Carlson was suspended, although Mr. Carlson's behavior was the result of his illness, the two people who disciplined him were not aware of this disability at that time. Additionally, even if Mr. Carlson's manager had known about his disability at that time, it was not a reasonable accommodation to allow Mr. Carlson to hang up on customers.

¶ 51. At the time of his termination, on the other hand, Wisconsin Bell had knowledge of Mr. Carlson's bipolar disorder and its symptoms from the 2010 Review Board Hearing because the same manager, Mr. Carl, was involved in both disciplinary hearings. Nevertheless, even with evidence of such requisite knowledge, establishing the causal link requires further analysis. In particular, for cases where the establishment of such a link is outside the expertise of LIRC, expert testimony must be provided to definitively ascertain that causal nexus. *See Wal-Mart*, 240 Wis. 2d 209, ¶ 19 ("[w]hether a causal link exists between [the

claimant]'s disability and the conduct which triggered his firing is a question of medical/scientific fact, not one of employment policies or practices").

¶ 52. For example, in *Wal-Mart* an employee was terminated for insubordination after an outburst at a meeting when he learned he was not getting a promotion. *Id.*, ¶ 3. The employee claimed that the angry outburst was a symptom of his obsessive-compulsive disorder (OCD). *Id.*, ¶ 4. LIRC had held that the termination was because of the employee's disability and therefore a WFEA violation, based in part on the testimony of the employee's therapist. *Id.*, ¶ 1. The court, however, found that the expert testimony from the employee's therapist was insufficient to provide the requisite causal link, because "she was never asked whether, in her professional opinion, [the employee]'s behavior on the day in question . . . was caused by, or likely to have been caused by, [the employee]'s OCD. *Id.*, ¶ 23.

¶ 53. Wisconsin Bell contends that, as in *Wal-Mart*, the evidence here is not sufficient to make the necessary causal link. Specifically, it argues that the additional letter submitted at the Review Board Hearing in May 2011 from Dr. Siegel regarding the change in medication, even taken together with the letters from Dr. Siegel and Mr. Cohen submitted in April 2010, was not conclusive in terms of establishing a connection between Mr. Carlson's bipolar disorder and his Q-Chatting with co-workers and leaving early for the day. Moreover, Wisconsin Bell asserts that Mr. Carlson did not affirmatively state that his conduct that day was a result of his condition. Therefore, Wisconsin Bell believes it was justified in not believing that Mr. Carlson's behavior was due to his bipolar disorder.

319

¶ 54. LIRC has in fact previously held that an employer "can escape liability if it demonstrates that it discharged the complainant because it genuinely and in good faith" believed its position. *Davis v. City of Milwaukee Police Dep't*, ERD Case No. CR200703169, *5 (LIRC, August 26, 2011). " 'Good faith' contemplates a situation in which an employer reasonably relies upon information that turns out to be incorrect." *Id.* However, an employer that "ignore[s] medical evidence . . . and relie[s] instead upon its own prejudices and assumptions" is not acting in good faith. *Id.*

¶ 55. That is the case here. LIRC points to the fact that Wisconsin Bell had knowledge of Mr. Carlson's bipolar disorder and its symptoms from the Review Board Hearing in April 2010, when Mr. Carlson first informed the Tier II Call Center managers about his disability and submitted the letters describing the symptoms from Dr. Siegel and Mr. Cohen. LIRC further found that Mr. Carlson's conduct in April 2011 was consistent with the symptoms described in those letters.

¶ 56. These findings are further supported by deposition testimony from Dr. Siegel and Mr. Cohen. Both indicated that Mr. Carlson's conduct in engaging in Q-Chatting with coworkers upon finding out he had failed the Collections Department exam was indicative of his bipolar condition. For example, Mr. Cohen pointed out that in comparing the reactions to such news between people with and without mental illness, there is generally a "difference in severity" and "a difference in . . . the ability to gain control." Additionally, Dr. Siegel noted that based on the Q-Chat content Mr. Carlson seemed "frantic" and was "searching out people" to "help him through . . . a difficult time." Dr.

Siegel further stated that these symptoms exhibited by Mr. Carlson were consistent with bipolar disorder.

¶ 57. In contrast, Wisconsin Bell simply chose not to believe Mr. Carlson, without giving any consideration to the information from his health care providers, and without procuring an expert of its own to provide a basis to contradict Mr. Carlson's experts. Therefore, Wisconsin Bell did not act in good faith in terminating Mr. Carlson under these circumstances.

¶ 58. Wisconsin Bell's argument regarding the reasonableness of LIRC's analysis is similar to one that was made, and rejected, in *Target*:

> Target is, in effect, arguing that [the WFEA] should be interpreted such that once the suggestions were made and not accepted, regardless of how little was known then by either party or how much was later learned, Target had met its obligation. While this may be a reasonable interpretation of the statute, LIRC's interpretation is also reasonable. LIRC's interpretation considers the employer's obligation not as a static one, but as one very much affected by the information it has, which may change. This is not contrary to the words of the statute. It is reasonable. And, as we mentioned, LIRC's finding concerning the information Target had is supported by the record.

*Target*, 217 Wis. 2d at 14–15.

¶ 59. Based on all of the evidence, LIRC determined that Mr. Carlson had in fact established the link between his conduct and his condition, and that Wisconsin Bell's response, that it simply did not believe him, was insufficient to contradict this evidence. As a result, LIRC determined that Mr. Carlson's conduct was caused by his mental illness and, as a result, his

termination was because of his mental illness, in violation of the WFEA. We find this to be a reasonable inference made by LIRC, based on substantial evidence in the record to this effect, and the language of the WFEA as applied to these facts.

■■■

¶ 60. Upon affirmatively finding that the first two factors for imposing liability on an employer under the WFEA have been met, the third factor—whether the employer is able to show that the adverse action was warranted—is addressed. Under WIS. STAT. § 111.34(2)(a), it is not a violation of the WFEA to take action against an employee based on the employee's disability "if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment." However, an employer must "reasonably accommodate" an employee's disability, unless such accommodation would "pose a hardship" for the employer. WIS. STAT. § 111.34(1)(b). In other words, if an employer refuses to reasonably accommodate an employee with a disability, and is not able to prove that the accommodation would pose a hardship to the employer, then the employer has violated the WFEA. *See Target*, 217 Wis. 2d at 10. The burden of proving this defense is on the employer. *Id.* at 9.

¶ 61. LIRC further explained the reasonable accommodation analysis in its decision in *Cook*:

> It is important to bear in mind, that the question of the applicability of the "reasonably related to . . . ability to adequately undertake the job-related responsibilities" exception comes into play only if it appears that a challenged employment decision was made because of a disability. It is also important to bear in mind, that the question of whether reasonable accommodation

was refused or would have posed a hardship comes into play only if it appears that a challenged employment decision was made because of a disability and that the disability which was the reason for a challenged employment action is reasonably related to the complainant's ability to do the job.

*Id.* at *2–3.

¶ 62. In its decision in the present case, LIRC determined that a "reasonable accommodation" analysis was not necessary because Mr. Carlson did not ask for an accommodation, such as requesting that the absence be covered under FMLA; rather, he "took advantage of two benefits of his employment, putting himself in health code and taking a partial sick day." LIRC also pointed out that these options "were available to [Mr. Carlson] on the same basis that they were available to any other sick employee."

¶ 63. These findings reversed those of the ALJ, who found that Mr. Carlson had requested an accommodation in both cases, and that Wisconsin Bell had waived the affirmative defense that the accommodation posed a hardship when it did not pursue this argument during the agency proceedings. However, we need not review this issue, as Wisconsin Bell does not dispute LIRC's finding that an accommodation was not requested, and none of the parties have raised this as an issue in this appeal. Therefore, we do not address the reasonable accommodation prong of the WFEA.

¶ 64. In sum, we conclude that LIRC's interpretation of the WFEA, particularly the application of the inference theory of causation, to which we have accorded great weight deference, is reasonable. We further conclude that there is sufficient evidence to support the imposition of liability on Wisconsin Bell based on the application of the inference method to these

facts. Accordingly, we reverse and remand the order of the circuit court with directions to enter a judgment and order affirming the decision of LIRC.

*By the Court.*—Order reversed and cause remanded with directions.