# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP355 |
| COMPLETE TITLE: | Wisconsin Bell, Inc.,<br>   Petitioner-Appellant-Petitioner,<br>  v.<br>Labor and Industry Review Commission and Charles E. Carlson,<br>   Respondents-Respondents. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 293, 895 N.W.2d 57
PDC No:  2017 WI App 24 - Published

| | |
|---|---|
| OPINION FILED: | June 26, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 1, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | Circuit |
|  COUNTY: | Milwaukee |
|  JUDGE: | Richard J. Sankovitz |

| | |
|---|---|
| JUSTICES: | |
|  CONCURRED: | |
|  DISSENTED: | A.W. BRADLEY, J., dissents, joined by ABRAHAMSON, J. (opinion filed). |
|  NOT PARTICIPATING: | |

ATTORNEYS:

For the petitioner-appellant-petitioner, there were briefs filed by *Julia S. Arnold*, *Laura A. Lindner*, *Casey M. Kaiser*, and *Littler Mendelson*, *P.C.*, Milwaukee.  There was an oral argument by *Laura A. Linder.*

For the respondent-respondent, Labor and Industry Review Commission, there was a brief filed by *Jeffrey J. Shampo*, *John L. Brown*, and *Wisconsin Labor and Industry Review Commission*, Madison.  There was an oral argument by *John L. Brown* and *Jeffrey J. Shampo.*

For the respondent-respondent, Charles E. Carlson, There was a brief filed by *Robert M. Mihelich* and *Law Offices of Robert M. Mihelich*, New Berlin. There was an oral argument by *Robert M. Mihelich*.

There was an amicus curiae brief filed on behalf of Wisconsin Manufacturers & Commerce by *Timothy G. Costello*, *Mark A. Johnson*, and *Ogletree*, *Deakins*, *Nash*, *Smoak & Stewart*, *P.C.*, Milwaukee.

There was an amicus curiae brief filed on behalf of Disability Rights Wisconsin and the Survival Coalition of Wisconsin by *Monica Murphy* and *Disability Rights Wisconsin*, Milwaukee.

There was an amicus curiae brief filed on behalf of Wisconsin Employment Lawyers Association by *Rebecca L. Salawdeh* and *Salawdeh Law Office*, *LLC*, Wauwatosa, with whom on the brief was *Caitlin M. Madden* and *Hawks Quindel*, *S.C.*, Madison.

**2018 WI 76**

No.  2016AP355
(L.C. No.  2015CV2133)

STATE OF WISCONSIN               :         IN SUPREME COURT

**Wisconsin Bell, Inc.,**

      **Petitioner-Appellant-Petitioner,**

      **v.**

**Labor and Industry Review Commission and Charles E. Carlson,**

      **Respondents-Respondents.**

REVIEW of a decision of the Court of Appeals.  *Reversed.*

¶1  DANIEL KELLY, J.  Charles E. Carlson says Wisconsin Bell, Inc. intentionally discriminated against him when it terminated his employment because of his disability.  Using the "inference method" of finding discriminatory intent, LIRC agreed and concluded that Wisconsin Bell violated the Wisconsin Fair Employment Act ("WFEA").  See Wis. Stat. ch. 111, subchapter II (2015-16).[1]

---

[1]  Because the relevant statutes have not changed during the pendency of this matter, all subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

¶2 We granted Wisconsin Bell's petition for review to determine whether LIRC's version of the "inference method" impermissibly allows imposition of WFEA liability without proof of discriminatory intent, and if so, whether that is consistent with the requirements of Wis. Stat. § 111.322(1).[2] Because resolving that issue implicates the authoritativeness of an administrative agency's interpretation and application of a statute, we asked the parties to also address this issue: "Does the practice of deferring to agency interpretations of statutes comport with Article VII, Section 2 of the Wisconsin Constitution, which vests the judicial power in the unified court system?"

¶3 We conclude that LIRC's version of the "inference method" is inconsistent with Wis. Stat. § 111.322(1) because it excuses the employee from his burden of proving discriminatory intent. We also conclude that the record lacks any substantial evidence that Wisconsin Bell terminated Mr. Carlson's employment because of his disability.

¶4 We heard arguments in this case on the same day we heard Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ___ Wis. 2d ___, ___ N.W.2d ___. There, we decided to end our practice of deferring to administrative agencies' conclusions of law. Id.,

---

[2] This is a review of a published court of appeals opinion, Wisconsin Bell, Inc. v. LIRC, 2017 WI App 24, 375 Wis. 2d 293, 895 N.W.2d 57, which reversed the Milwaukee County Circuit Court, the Honorable Richard J. Sankovitz, presiding, and remanded with instructions.

¶3. However, we also said that, pursuant to Wis. Stat. § 227.57(10), we will give "due weight" to an administrative agency's experience, technical competence, and specialized knowledge as we consider its arguments. Tetra Tech EC, Inc., ___ Wis. 2d ___, ¶3. Our Tetra Tech EC, Inc. opinion contains our analysis of the issue, which we incorporate and apply here.

## I. BACKGROUND

### A. Mr. Carlson's Disability

¶5 Mr. Carlson suffers from bipolar I disorder, a mental illness that can affect an individual physically, socially, and intellectually.[3] Symptoms of bipolar disorder include, but are not limited to, irritability, racing thoughts, and impulsive behaviors. Bipolar symptoms can ebb and flow, and both internal and external conditions such as stress, changes in environment, and conversations can trigger symptoms. Bipolar disorder is primarily treated with medication and psychotherapy, and during the relevant time period, Mr. Carlson was receiving treatment from psychotherapist Edward L. Cohen, LCSW, who began treating him in 1997, and psychiatrist Mark Siegel, M.D., who began treating him in 2002.

---

[3] Mr. Carlson has also been diagnosed with dysthymic disorder and major depressive disorder, which are also mental impairments. However, because the disability primarily referenced throughout the record and briefing in regard to Mr. Carlson's termination is Mr. Carlson's bipolar disorder, we, too, focus on that disability.

¶6 Mr. Carlson can recognize when he is having what he refers to as a "bipolar episode" or "breakthrough episode." According to Mr. Cohen, Mr. Carlson's reference to having one of these "episodes" refers to a short time period in which he experiences symptoms of mania, which can include racing thoughts, impulsive behaviors, disregard for consequences, or symptoms of depression. Through the course of his treatment, Mr. Carlson has learned various coping techniques he can use to address his symptoms when they arise. These coping techniques include going to a separate room without distractions, using deep breathing exercises, and communicating with others for support.

B. Mr. Carlson's Wisconsin Bell Employment History

¶7 Mr. Carlson was a Wisconsin Bell employee for approximately 25 years prior to his termination in May 2011.[4] In his last position with the company he served as a Technical Support Representative II ("TSR") at the U-verse Tier II call center. The terms of Mr. Carlson's position were governed by a Collective Bargaining Agreement ("CBA") between Wisconsin Bell and the Communication Workers of America Local 4603 (the "Union").

¶8 As a TSR, Mr. Carlson worked with customers and field technicians to resolve technical issues related to Wisconsin

---

[4] Wisconsin Bell first employed Mr. Carlson in 1980 and at some point he left Wisconsin Bell for approximately five or six years prior to returning.

4

Bell's "U-verse" telephone, internet, and television services. TSRs generally received calls based on their availability and could control receipt of calls by making themselves unavailable by entering certain call-blocking codes——such as for meal and rest breaks, short health breaks (such as for using the restroom), and for approved training and staff meetings——into an automated phone system. When call volume was high, the call center would declare a "Code Red" status, which meant that all TSRs were expected to be available to take calls. Wisconsin Bell's Office Rules stated that inappropriate use of call-blocking codes to avoid taking customer calls could result in immediate termination.

¶9 TSRs also had access to an internal instant messaging system referred to as "Q-chat," which allowed TSRs to communicate with technicians and co-workers. Although Q-chat was primarily meant to be used for business purposes, TSRs occasionally used it for personal reasons such as making lunch plans with other employees; however, TSRs were subject to discipline if personal use of Q-chat became disruptive, excessive, or interfered with customer service.

### 1. Mr. Carlson's 2010 Suspension

¶10 On February 18, 2010, Jeannette Weber, a Wisconsin Bell Operations Manager, was remotely reviewing TSRs, including Mr. Carlson, for quality assurance purposes. While doing so, she noticed Mr. Carlson had been in the "call wrap" status——a post-call code that allowed a TSR to briefly make himself unavailable for incoming calls in order to document interactions

5

from the prior call——for approximately 20 minutes. After questioning Mr. Carlson about the length of his "call wrap" status, Mr. Carlson opened his line for incoming calls. Unbeknownst to him, Ms. Weber continued to observe him remotely, and over the next ten minutes, she observed Mr. Carlson deliberately hang up on at least eight customer calls.[5] Ms. Weber informed Jason Carl, the call center's top manager, about Mr. Carlson's actions, and Mr. Carl thereafter suspended Mr. Carlson pending termination for customer mistreatment and call avoidance.

¶11 Mr. Carlson's Union representative requested a review board hearing to challenge the suspension. At the hearing on March 4, 2010, Mr. Carlson explained that he disconnected the calls because he was upset that Ms. Weber had questioned the length of his "call wrap" status. He also presented letters from Mr. Cohen and Dr. Siegel, which described his disability and its symptoms in general terms. Dr. Siegel's letter (dated March 1, 2010) indicated that it was prepared at Mr. Carlson's request and explained that Mr. Carlson suffered from "bipolar disorder-depressed type," that "[b]ipolar disorder is a condition characterized by extremes of mood that could manifest

---

[5] There are conflicting references in the record as to whether Mr. Carlson hung up on eight calls or twelve calls during that time period. It appears the discrepancy is related to the number of calls Mr. Carlson actually terminated improperly versus the number of calls Ms. Weber personally observed him improperly terminate. For the purposes of this opinion, we need not resolve this discrepancy.

in a significant depression with or without problems associated with anxiety and irritability[,]" and that with bipolar disorder, "[e]xtremes of moods can occur rather quickly and [are] often triggered by relatively minor frustrations." Mr. Cohen's letter (dated February 24, 2010) likewise indicated it had been prepared for the review board hearing and stated that Mr. Cohen was seeing Mr. Carlson for individual psychotherapy services for dysthymia,[6] major depressive disorder-recurrent, and bipolar disorder. Neither letter drew a connection between Mr. Carlson's bipolar disorder and his actions on February 18, 2010. Prior to receiving these letters at the hearing, Mr. Carl, the ultimate decision-maker as to whether to terminate Mr. Carlson's employment, was unaware that Mr. Carlson suffered from bipolar disorder.

¶12 Ultimately, Mr. Carlson received a 50-day suspension without pay. Wisconsin Bell informed Mr. Carlson that if he needed an accommodation for his condition in the future, he should request one. As a condition of his return to work, Mr. Carlson was required to sign a "last chance agreement." This agreement was in effect from May 1, 2010, through April 30, 2011, and it detailed specific circumstances in which Wisconsin Bell would have just cause to terminate Mr. Carlson's employment, including the following:

---

[6] Dysthymia has been defined as "despondency" and "morbid anxiety and depression accompanied by obsession." Dysthymia, Webster's Third New International Dictionary 712 (1986).

7

Mr. Carlson understands that in the future, if it is deemed that he has another Customer Care Issue be it Customer Care, Customer Mistreat, disconnection of any incoming or outgoing customer call or any underlying issue that directly impacts the care of one of our customers for any reason, the Company will have just cause to terminate his employment. The Company may consider mitigating circumstances in making its dismissal decision but retains sole-discretion [sic] to determine whether or not the dismissal is appropriate under the circumstances.

Mr. Carlson understands that if it is determined that he has lied or otherwise committed a breach of integrity as demonstrated by violation of Tech Expectations/work rules, Company policy, Code of Conduct, or has falsified reasons for absences or tardies, the Company will have just cause to terminate his employment. The Company may consider mitigating circumstances in making its dismissal decision but retains sole-discretion [sic] to determine whether or not the dismissal is appropriate under the circumstances.

Mr. Carlson was eligible to return to work on May 1, 2010, and he signed the last chance agreement on May 3, 2010.

### 2. Mr. Carlson's 2011 Termination

¶13 On April 20, 2011——ten days before the last chance agreement expired——Mr. Carlson informed Wisconsin Bell shortly before 12:00 p.m. that he was leaving work early due to illness. About an hour earlier, he learned he had not passed a test that would have made him eligible for a position in Wisconsin Bell's collections department. Mr. Carlson became upset, tearful, unfocused, and depressive. Within a few minutes, he entered the call-blocking "health code" so he would not receive incoming customer calls.

¶14 Mr. Carlson then approached his supervisor, Operations Manager Kristi Reidy, to determine whether he would face

8

disciplinary action if he left work early due to illness. Ms. Reidy told him he should do what he needed to do and advised him the absence would be treated as an "occurrence" based on the amount of time he would be absent.[7] Although Mr. Carlson informed her that he "wasn't doing well," he did not otherwise explain his symptoms or mention his bipolar disorder.

¶15 After speaking with Ms. Reidy, Mr. Carlson returned to his desk and, while remaining in the health code call-blocking status, engaged in Q-chats with approximately 15 co-workers—the majority of which he initiated—over the ensuing 30 minutes.[8] The Q-chats primarily related to the collections department position for which he did not qualify and inquiries as to whether others who had applied for the position had passed the exam. In one instance, Mr. Carlson encouraged a co-worker to enter the health status call-blocking code for the purpose of checking her test results, saying that doing so was "worth a

---

[7] At the time, Wisconsin Bell counted work absences greater than two hours and less than two hours differently. An absence greater than two hours was considered an "occurrence," whereas an absence less than two hours was considered a "partial absence." The previous day, April 19, 2011, Mr. Carlson received a written warning for his eighth partial absence in the previous twelve months. If the absence Mr. Carlson was contemplating were to be treated as a partial absence rather than an occurrence, he could have been subjected to a one-day suspension without pay.

[8] After reviewing Mr. Carlson's Q-chats, Wisconsin Bell determined that unlike Mr. Carlson, his co-workers had been performing their job duties and had not been in call-blocking status during the course of the chats.

9

health break for." In addition to discussing test results with numerous co-workers, Mr. Carlson also reached out to his Union steward via Q-chat to confirm that his absence would qualify as an "occurrence." When his Union steward confirmed that was correct, Mr. Carlson responded "oh good I'm outta here I didn't pass the interview for collections." Mr. Carlson suggested in some of the Q-chat messages that he was upset about not qualifying for the transfer and that he felt like crying, but he never mentioned his bipolar disorder.

¶16 Shortly before 12:00 p.m., LaDonna Sneed-Brown, an Operations Manager, was reviewing TSR availability because the Tier II Call Center was in Code Red at the time and noticed that Mr. Carlson had been in health break status——rendering him unavailable for incoming customer calls——for 38 minutes. After reaching out to Mr. Carlson via Q-chat to question his status, Mr. Carlson responded that he "forgot" and that he was "leaving ill." He then responded "ttyl [talk to you later] and thanks for being there as one of my lesbian friends." When Ms. Sneed-Brown questioned his response, Mr. Carlson stated "sorry wrong window." Afterwards, he notified the help-desk he was leaving for the day.

¶17 Because of Mr. Carlson's reference to the "wrong window," Ms. Sneed-Brown suspected he had been engaged in additional Q-chats while in health code status and reported the interaction and her suspicion to Ms. Reidy. When asked about the Q-chats upon returning to work the following day, Mr. Carlson made no reference to having been ill, using the Q-chats

10

as a coping mechanism, or to his absence having been related to his bipolar disorder.

¶18 After reviewing Mr. Carlson's Q-chats, Mr. Carl concluded that, based on their tone and content, Mr. Carlson had not really been ill and that he had simply been "chitchatting" with his co-workers while in a call-blocking code status. Mr. Carlson thereafter received a notice of Suspension Pending Termination dated April 21, 2011, for violating Wisconsin Bell's zero tolerance policy for inappropriate use of call-blocking codes to avoid taking customer calls.

¶19 Mr. Carlson again requested a review board hearing, which occurred on May 26, 2011. At that hearing, Mr. Carlson said he had used the health code on April 20th because he was upset after learning he had not qualified for the collections department position and that he reached out to co-workers via Q-chat as a coping mechanism. Mr. Carlson's union representative also explained that Mr. Carlson "doesn't react to things like everybody else." As he had done at the 2010 review board hearing, Mr. Carlson presented a letter from Dr. Siegel, this one dated May 9, 2011, regarding his bipolar disorder. The letter indicated that Mr. Carlson's "diagnosis remains bipolar disorder-depressed type" and briefly described increases in some of Mr. Carlson's medications. After Mr. Carlson presented the letter, Mr. Carl indicated that they had "seen this before." Nothing in Dr. Siegel's 2011 letter connected Mr. Carlson's bipolar disorder to his actions on April 20, 2011.

¶20 Following the review board hearing, Mr. Carl concluded that Mr. Carlson had violated the last chance agreement and Wisconsin Bell's zero tolerance policy when he used the health code to make himself unavailable for customer calls for 38 minutes.  Specifically, he concluded that Mr. Carlson had engaged in "call avoidance" and committed an integrity violation when he left work early because he did not believe Mr. Carlson was being truthful about having been ill.  Wisconsin Bell formally terminated Mr. Carlson's employment on June 7, 2011.

### C.  Procedural Background

¶21  Mr. Carlson filed two complaints with the ERD.  In the first, ERD Case No. CR201102363, Mr. Carlson alleged his 2010 suspension was because of his disability.  In the second, ERD Case No. CR201200428, Mr. Carlson alleged that Wisconsin Bell terminated his employment because of his disability and as retaliation for having filed the first ERD complaint.  The two complaints were consolidated for a multi-day hearing before Administrative Law Judge James A. Schacht ("ALJ") in 2013.  Prior to beginning the hearing, the ALJ confirmed that Mr. Carlson was withdrawing his retaliation claim.[9]

---

[9] Although the ALJ confirmed that Mr. Carlson was withdrawing his retaliation claim, the ALJ (and later LIRC), for whatever reason, included a finding in his decision that Mr. Carlson had failed to establish that Wisconsin Bell had violated the WFEA by terminating him in retaliation for his having previously filed a complaint.

¶22 In an April 25, 2014 decision, the ALJ concluded that Wisconsin Bell violated the WFEA when it suspended Mr. Carlson in 2010 and when it terminated Mr. Carlson's employment in 2011. The ALJ also concluded that Wisconsin Bell could have, but did not, accommodate Mr. Carlson's disability with respect to his February 2010 conduct. Accordingly, the ALJ ordered that Wisconsin Bell reinstate Mr. Carlson with back pay, reasonably accommodate his disability, and pay Mr. Carlson's attorney's fees and costs.

¶23 Wisconsin Bell appealed the ALJ's decision to LIRC. LIRC reversed the ALJ's decision as to Mr. Carlson's suspension and accommodation claims. It found that although Mr. Carlson's bipolar disorder caused his conduct (repeatedly hanging up on customers) and that the suspension was therefore because of his disability, the conduct violated a uniform rule prohibiting customer mistreatment and that excusing him for his behavior would not have been a reasonable accommodation. LIRC further explained that its conclusion was based on its finding that at the time Mr. Carlson engaged in the February 2010 conduct, his supervisor and manager had no knowledge of his disability. Thus, LIRC dismissed Mr. Carlson's 2011 ERD complaint.

¶24 With respect to the termination claim, however, LIRC concluded that Wisconsin Bell violated the WFEA. It found that Mr. Carlson's supervisors and managers were aware of his bipolar disorder at the time of the April 20th incident, his disability caused his conduct on that day, he did nothing more than take "advantage of two benefits of his employment"——use of the health

13

code and taking a partial sick day——that "were available to any other sick employee," and therefore he "did not violate any attendance or performance requirement." But it also found that Mr. Carl did not believe Mr. Carlson's claim on April 20th that he used the health code and left for the day because he was sick: "Based on their own interpretation of Carlson's Q-chats, they [Mr. Carlson's supervisors] concluded that Carlson was not sick, and they terminated his employment for faking an illness to get out of work." Accordingly, LIRC affirmed the ALJ's order that Wisconsin Bell reinstate Mr. Carlson with back pay and pay Mr. Carlson's attorney's fees and costs.

¶25 In the memorandum opinion accompanying its decision, LIRC explained the rationale it used to conclude Wisconsin Bell violated the WFEA. It said that "if an employer discharges a disabled employee for some unsatisfactory conduct, and the employee is able to show that his or her conduct was caused by a disability, the discharge was 'in legal effect' because of the employee's disability." LIRC said this analytical device allows the decision-maker to shift his focus "from whether the disability caused the discharge to whether the disability caused the unsatisfactory conduct."

¶26 Wisconsin Bell petitioned the circuit court for review of LIRC's decision regarding the termination of Mr. Carlson's

employment.[10] In a very thoughtful written decision, the circuit court concluded that it is reasonable to infer intent from surrounding circumstances, but decided LIRC's findings and analysis were incomplete because it had failed to address whether Wisconsin Bell knew at the time it terminated Mr. Carlson that his conduct was caused by his bipolar disorder. So it remanded the matter to LIRC for further proceedings.

¶27 Wisconsin Bell appealed the circuit court's order. The court of appeals determined that great weight deference to LIRC's interpretation was appropriate[11] and concluded that LIRC's use of the "inference method" was reasonable, but that the employer must know of the causal link between the disability and the conduct on which the employer based its employment action. Wis. Bell, Inc. v. LIRC, 2017 WI App 24, ¶¶45-46, 375 Wis. 2d 293, 895 N.W.2d 57. The court of appeals concluded, contrary to the circuit court, that there was sufficient evidence known to Wisconsin Bell at the time it terminated Mr. Carlson's employment that his behavior on April 20th was caused

---

[10] Mr. Carlson did not seek review of LIRC's denial of his claim related to Wisconsin Bell's suspension decision (ERD Case No. CR201102363). Therefore, the only matter before the court is ERD Case No. CR201200428, which addresses Wisconsin Bell's termination of Mr. Carlson's employment.

[11] See Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 661, 539 N.W.2d 98 (1995) ("Once it is determined . . . that great weight deference is appropriate, we have repeatedly held that an agency's interpretation must then merely be reasonable for it to be sustained."), overruled by Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶¶82-84, ___ Wis. 2d ___, ___ N.W.2d ___.

by his disability. Id., ¶¶54-59. Accordingly, it reversed the circuit court and directed it to enter an order affirming LIRC's decision. Id., ¶64. We granted Wisconsin Bell's petition for review.

## II. STANDARD OF REVIEW

¶28 In cases involving administrative agencies we review the decision of the agency, not the decision of the court of appeals or circuit court. Estate of Szleszinski v. LIRC, 2007 WI 106, ¶22, 304 Wis. 2d 258, 736 N.W.2d 111. Judicial review of LIRC's decisions is governed by Wis. Stat. § 111.395, which provides that "[f]indings and orders of the commission under this subchapter are subject to review under ch. 227."

¶29 We review an administrative agency's interpretation and application of statutes de novo. Tetra Tech EC, Inc., ___ Wis. 2d ___, ¶84 ("[W]e will review an administrative agency's conclusions of law under the same standard we apply to a circuit court's conclusions of law——de novo."). Consequent upon that review, "[t]he court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law." Wis. Stat. § 227.57(5).

¶30 Our review of LIRC's findings of fact is limited: "If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence

16

on any disputed finding of fact." Wis. Stat. § 227.57(6). We will set aside or remand a matter to the agency based on a factual deficiency only if "the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Id.; see also Crystal Lake Cheese Factory v. LIRC, 2003 WI 106, ¶27, 264 Wis. 2d 200, 664 N.W.2d 651. "Substantial evidence does not mean a preponderance of evidence. It means whether, after considering all the evidence of record, reasonable minds could arrive at the conclusion reached by the trier of fact." Milwaukee Symphony Orchestra, Inc. v. DOR, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674.

### III. ANALYSIS

#### A. Employment Discrimination Under the WFEA

¶31 An employer engages in employment discrimination if it terminates a person from employment "because of any basis enumerated in s. 111.321." Wis. Stat. § 111.322(1). As applicable here, Wis. Stat. § 111.321 prohibits an employer from engaging in employment discrimination on the basis of a "disability." Id. However, an employer may nonetheless terminate a person's employment if "the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment." See Wis. Stat. § 111.34(2)(a).

¶32 Mr. Carlson's claim of employment discrimination under Wis. Stat. § 111.321 can succeed only if the following three propositions are true: (1) he has a disability; (2) Wisconsin Bell terminated his employment "because of" that disability; and

17

(3) Wisconsin Bell had no justification under Wis. Stat. § 111.34 for terminating his employment. See Crystal Lake Cheese Factory, 264 Wis. 2d 200, ¶67 (citing Target Stores v. LIRC, 217 Wis. 2d 1, 9-10, 576 N.W.2d 545 (Ct. App. 1998)); see also Brown Cty. v. LIRC, 124 Wis. 2d 560, 572-73, 369 N.W.2d 735 (1985).[12] The parties agree that Mr. Carlson has a disability cognizable by § 111.321. Therefore, our analysis begins with the second proposition.

¶33 Under the disparate treatment theory, an employer engages in employment discrimination contrary to Wis. Stat. § 111.321 if it "treats some people less favorably than others because they belong to a protected class." Racine Unified Sch. Dist. v. LIRC, 164 Wis. 2d 567, 595, 476 N.W.2d 707 (Ct. App. 1991). To be actionable, the employer must have acted with discriminatory intent. Id. ("[A] complainant asserting a disparate treatment theory must prove discriminatory intent to prevail, . . . .").

B. LIRC's Intentional Discrimination Analysis

¶34 LIRC says it may use either of two methods in determining whether Wisconsin Bell intentionally terminated Mr. Carlson's employment "because of" his disability. The first

---

[12] Mr. Carlson bears the burden of proof with respect to the first two propositions; with respect to the third proposition, Wisconsin Bell bears the burden of proving it had a legally-cognizable justification for the adverse employment action. See Brown Cty. v. LIRC, 124 Wis. 2d 560, 572-73, 369 N.W.2d 735 (1985); see also Crystal Lake Cheese Factory v. LIRC, 2003 WI 106, ¶67, 264 Wis. 2d 200, 664 N.W.2d 651.

method asks whether the employer held "actual discriminatory animus against an employee because that employee was an individual with a disability[.]" Maeder v. Univ. of Wisconsin-Madison, ERD Case No. CR200501824 (LIRC June 28, 2013). The alternative method, known as the "inference method," finds intent to discriminate when an employer bases its adverse action on "a problem with that employee's behavior or performance which is caused by the employee's disability." See id. ("If an employee is discharged because of unsatisfactory behavior which was a direct result of a disability, the discharge is, in legal effect, because of that disability.").

¶35 LIRC used the inference method in Mr. Carlson's case, and described it as follows:

> [T]he commission determines the employer's intent by inference based on the surrounding circumstances. Its analysis begins by stating a logical chain of causation: 1) if an employee's disability causes certain behavior, and 2) the employer takes action against the employee on the basis of that behavior, then 3) the employer has taken action against the employee because of the disability.

Inferring discriminatory intent from circumstantial evidence is, of course, quite common. See, e.g., Stern v. Thompson & Coates, Ltd., 185 Wis. 2d 220, 236-37, 517 N.W.2d 658 (1994) (stating that a person's state of mind "must be inferred from the acts and statements of the person, in view of the surrounding circumstances." (citation and quotation marks omitted)). The question, therefore, is whether LIRC's version of the "inference

19

method" preserves the employee's burden of proving an employer's intent to discriminate against him because of his disability.

¶36 LIRC assures us it has always required "proof of an employer's discriminatory state of mind . . . before liability could attach," and cites several of its cases to illustrate its commitment to this principle. The citations, however, do not support the proposition. In Conley v. DHSS, Case No. 84-0067-PC-ER (Wis. Personnel Comm'n June 29, 1987), the Personnel Commission[13] said the employer cannot defeat the "because of" element of the employee's claim "simply by stating that its motivation for discharging the complainant was his inability to perform his duties where any such inability has resulted directly from the handicapping condition." Although the causal link between Conley's disability and his inability to perform his duties was obvious to all concerned, nothing in the Personnel Commission's analysis actually required the employee to prove the employer was aware of the link. That is, the Personnel Commission's analysis would allow an employee to prove discrimination simply by demonstrating he had a disability and he was terminated because of behavior caused by that disability. The same is true of Bell-Merz v. Univ. of Wis. Sys. (Whitewater), Case. No. 90-0138-PC-ER (Wis. Personnel Comm'n Mar. 19, 1993), where the employer knew of the causal connection between disability and conduct resulting in termination, but

---

[13] LIRC inherited part of the Personnel Commission's duties after it was abolished in 2003.

20

nothing in the analysis <u>required</u> that it know of the connection.[14] And <u>Stroik v. Worzalla Publishing Co.</u>, ERD Case No. CR200002461 (LIRC July 16, 2004), did not even attempt to address whether discriminatory intent requires an employer to know the connection between an employee's disability and the conduct for which his employment is terminated. In fact, LIRC did not cite a single case in which it <u>required</u> proof that the employer knew the employee's disability caused his conduct.

¶37 LIRC approached the proposition most closely when it cited <u>Volkmann</u>, in which it found no discriminatory intent because the employer had never been informed that the employee had a disability. <u>Volkmann v. Colonial Mgmt. Grp. LP</u>, ERD Case No. CR201102513 (LIRC Jan. 30, 2015). That is a necessary, but not sufficient, step in showing that it always requires proof of intent before finding liability. Ignorance of the employee's disability must certainly foreclose a finding of intentional discrimination. But that still leaves the question of whether LIRC would require the employee to prove the employer knew of the connection between a disability and the conduct for which it terminated employment. That is the question before the court, and <u>Volkmann</u> provides no answer. Similarly, in <u>Wester v.</u>

---

[14] <u>See also</u> <u>Stelloh v. Wauwatosa Sav. Bank</u>, ERD Case No. CR200700340 (LIRC June 19, 2012) (same); <u>Crivello v. Target Stores</u>, ERD Case No. 9252123 (LIRC Aug. 14, 1996), <u>aff'd sub nom</u> <u>Target Stores v. LIRC</u>, 217 Wis. 2d 1, 576 N.W.2d 545 (Ct. App. 1998) (same); <u>Staats v. Ctys. of Sawyer and Bayfield</u>, ERD Case No. 9500906 (LIRC Oct. 27, 1997) (same).

21

<u>Charter Media/Communications</u>, LIRC said an employee may prove intentional discrimination by showing "the alleged discriminators would have had reason to be aware that she was disabled, or perceived her to be disabled, at the time the allegedly discriminatory actions were taken." ERD Case No. CF200003872 (LIRC Oct. 15, 2004). But it said nothing about any requirement that the employer know of the connection between the disability and the employee's conduct.

¶38 LIRC has been cautioned before about the significance of the causal relationship between an employee's disability and his conduct when establishing discriminatory intent under the inference method. Almost two decades ago, the court of appeals reviewed a case in which LIRC "declared, without further discussion, that a firing for misconduct equates to a firing because of the underlying causal disability." <u>Wal-Mart Stores, Inc. v. LIRC</u>, 2000 WI App 272, ¶28, 240 Wis. 2d 209, 621 N.W.2d 633. The court of appeals delicately questioned whether this rationale was sufficient for a finding of intentional discrimination:

> The question of whether a firing for misconduct caused by a disability equates, as a matter of law, to a firing because of disability, is of some importance, and it involves significant policy implications. We therefore invite the commission on remand to expand on the rationale for its adoption of the Personnel Commission's interpretation, which is the subject of some disagreement among federal courts.

See id. The Wal-Mart Stores, Inc. matter settled before the agency could address it on remand, so there was no occasion to explore the question further.

¶39 We pick up where Wal-Mart Stores, Inc. left off. We agree that the transitive nature of LIRC's inferential methodology is an important matter. In fact, the methodology cannot function without it. LIRC says this is where its analysis of discriminatory intent begins, but it also appears to be where it ends. And it is a very premature end. Because it goes no further, LIRC's methodology actually requires a double inference to reach its goal, and only one of them is justifiable. The first is that, when an employer observes conduct caused by an employee's disability, the employer knows of the causal connection. The other is that, in terminating employment because of the employee's conduct, the employer is actually terminating him because of his disability.

¶40 The first inference presents an insuperable problem for LIRC's methodology. In the search for discriminatory intent via the inferential method, there is, quite literally, no evidence more important than the employer's knowledge of the causal connection between conduct and disability. This knowledge is what allows us to logically transfer the employer's intent from the former to the latter. If Wisconsin Bell did not know of this connection, the most that could be said of its state of mind would be that it intended to terminate Mr. Carlson's employment because of his conduct. The WFEA does not forbid this. It forbids Wisconsin Bell from terminating his

23

employment because of his _disability_. Excusing the employee from proving the employer's knowledge of the causal connection allows LIRC to find intentional discrimination where there is no proof of it.

¶41 For these reasons, LIRC's double-inference methodology is structurally flawed. We conclude that an employer does not engage in intentional discrimination when it bases an adverse employment action on the employee's conduct unless the employee proves the employer knew his disability caused his conduct.[15]

¶42 As we considered LIRC's arguments concerning its double-inference methodology, we gave "due weight" to its "experience, technical competence, and specialized knowledge." See Wis. Stat. § 227.57(10); see also Tetra Tech EC, Inc., ___ Wis. 2d ___, ¶¶77-79, 84. The factors informing how much weight is due include the considerations we previously used in deciding whether we would defer to an administrative agency's conclusions

---

[15] Justice Ann Walsh Bradley endorses LIRC's double-inference methodology because without it, she says, the WFEA loses its "teeth." Dissent, ¶¶55, 63. She says this approach "reasonably equates discrimination against the symptoms of a disability with discrimination against a person who has a disability." Id., ¶66. The WFEA protects individuals against discrimination because of a disability; Justice Bradley wants to protect disabilities against discrimination because of a symptom. The two are not the same, and only the former may be found in our statutes. Allowing one to stand in for the other could make an employer liable for intentionally discriminating against a person because of his disability without even knowing he has one. There is quite certainly nothing reasonable about that. And that is why we cannot countenance LIRC's double-inference methodology.

of law, such as: "(1) whether the legislature made the agency responsible for administering the statute in question; (2) the length of time the administrative agency's interpretation has stood; (3) the extent to which the agency used its expertise or specialized knowledge in developing its position; and (4) whether the agency's perspective would enhance uniformity and consistency of the law." Tetra Tech EC, Inc., ___ Wis. 2d ___, ¶79.

¶43 We recognize that the legislature charged LIRC with deciding contested cases under the WFEA, and it certainly handles many such cases every year.[16] Additionally, we recognize the importance of "uniformity and consistency" in the application of the WFEA. Employers and employees alike need a stable framework within which they can manage their relationships. However, the need for stability and LIRC's long-standing practice do not persuade us that its double-inference methodology is consistent with the WFEA.

## C. Wisconsin Bell's Knowledge

¶44 The inferential method of proving discriminatory intent, properly formulated, requires that we now address what Wisconsin Bell knew about the causal link between Mr. Carlson's behavior and his disability. Specifically, we are interested in

---

[16] Statistics regarding the number of appeals LIRC receives and the number of decisions issued per year can be found at http://lirc.wisconsin.gov/lirc_stats.htm (last visited June 5, 2018). Over the past five years (2013-2017), LIRC has issued an average of 87 equal rights decisions per year.

what Wisconsin Bell knew about that subject at the time it terminated Mr. Carlson's employment. This is the necessary temporal point of reference, of course, because our project here is to discover the intent behind Wisconsin Bell's termination decision. One cannot retroactively intend something, so the intent must precede or accompany the act.[17] Therefore, what Wisconsin Bell (or the ALJ or LIRC, for that matter) learned about the causal connection after the termination is of no import because only contemporaneous knowledge can account for the intent that motivates an action.

¶45 When Wisconsin Bell terminated Mr. Carlson's employment, here is what it knew:

- At the review hearing related to the incident of February 18, 2010, Mr. Carlson claimed that his disability caused him to hang up on customer calls.

- Dr. Siegel's letter of March 1, 2010, said Mr. Carlson suffers from "bipolar disorder-depressed type," which is "characterized by extremes of mood that could manifest in a significant depression with or without problems associated with anxiety and irritability[,]" and that with bipolar disorder, "[e]xtremes of moods can occur

---

[17] Black's Law Dictionary defines "intent" as "[t]he state of mind accompanying an act, esp[ecially] a forbidden act." Intent, Black's Law Dictionary (10th ed. 2014). Likewise, Webster's definition of "intent" includes "the state of mind or mental attitude with which an act is done" and "the design or purpose to commit any wrongful . . . act that is the natural and probable consequence of other voluntary acts or conduct." Intent, Webster's Third New International Dictionary 1176 (1986).

rather quickly and [are] often triggered by relatively minor frustrations."

- Mr. Cohen's letter, also prepared for the review board hearing, said he was seeing Mr. Carlson for individual psychotherapy services for dysthymia, major depressive disorder-recurrent, and bipolar disorder.

- At the review hearing related to the incident on April 20, 2011, Mr. Carlson maintained that he had become upset when he learned he had failed the collections test and put himself in health code because he was too upset to take calls. He said that he Q-chatted as a way to get support from his co-employees. As with the prior incident, Mr. Carlson said his disability caused his conduct.

- Mr. Carlson offered a new letter from Dr. Siegel to support his claim. The letter said that Mr. Carlson continued to be diagnosed as bipolar, depressed type, and it summarized recent medication changes.

¶46 The sum total of information at Wisconsin Bell's disposal consisted of Mr. Carlson's claim of causation and three letters confirming his bipolarism——none of which mentioned any causal nexus between his disability and conduct. The consequences of bipolarism are not matters of common knowledge.

Because of the amorphous nature of this disability,[18] an employee's bare assertion of causality cannot be credited as authoritative. To conclude otherwise would allow Mr. Carlson to unilaterally bring any of his misbehavior under the protective cloak of the WFEA. As LIRC has previously recognized, this is neither practical nor rational. See, e.g., Maeder, ERD Case No. CR200501824 (LIRC June 28, 2013) ("[I]t is clear that it cannot simply be presumed that every act of bad behavior engaged in by a person with a mental disorder is caused by that mental disorder."). And as the circuit court aptly observed, "[i]f an employer isn't aware that certain behavioral or performance problems are symptomatic of a given disability, it hardly seems reasonable to accuse the employer of being motivated by the underlying disability."

¶47 The letters Mr. Carlson presented do not even purport to put Wisconsin Bell on notice of the connection between Mr. Carlson's disability and his behavior at work. Doctor Siegel's letter of March 1, 2010, says "I am writing this letter at your

---

[18] Dr. Siegel said "[b]ipolar disorder is a condition characterized by extremes of mood that could manifest in a significant depression with or without problems associated with anxiety and irritability[,]" and that with bipolar disorder, "[e]xtremes of moods can occur rather quickly and [are] often triggered by relatively minor frustrations." The amorphousness of this description is why expert testimony is needed to determine whether "an individual's bad behavior is caused by a mental disorder from which the individual suffers." Maeder v. Univ. of Wisconsin-Madison, ERD Case No. CR200501824 (LIRC June 28, 2013) (citing Wal-Mart Stores, Inc. v. LIRC, 2000 WI App 272, ¶16, 240 Wis. 2d 209, 621 N.W.2d 633).

request to identify your current diagnosis." So not only does the letter not describe a causal connection regarding the events of February 18, 2010, Mr. Carlson apparently did not ask him to say anything about that subject. This omission is especially significant because Dr. Siegel knew how Mr. Carlson was going to use the letter. He wrote: "I understand you will be passing this letter along to your employer in a current work-related problem." And yet the letter says not a word about any causative link.

¶48 Mr. Cohen's four-sentence letter of February 24, 2010, is no more enlightening than Dr. Siegel's missive. It, too, identified several diagnoses and acknowledged that Mr. Carlson had requested the letter for use in the upcoming review board hearing. As with Dr. Siegel's letter, it says nothing about any connection between Mr. Carlson's disability and his conduct on February 18, 2010 and April 20, 2011.

¶49 Doctor Siegel provided his second letter after the events of April 20, 2011. He said he was "writing to update you [Mr. Carlson] on your treatment, condition and diagnosis and following up on my previous letter to you on 03/01/2010." The update was that his diagnosis remained as it was before.[19]

---

[19] Notwithstanding the letters' enigmatic generalities, Justice Ann Walsh Bradley claims "these letters precisely describe the actions that ultimately led to Carlson's termination." Dissent, ¶73. There was, quite literally, nothing precise about these letters, and she offers no quote to suggest otherwise.

29

¶50 Therefore, when Wisconsin Bell terminated Mr. Carlson's employment, it knew nothing more than that its employee claimed his bipolarism caused his conduct. LIRC's memorandum opinion persuasively (albeit unintentionally) demonstrates that this sparse evidence could not have informed Wisconsin Bell that Mr. Carlson's conduct was the result of his bipolarism. LIRC conceded that spotting such a connection is beyond the ken of laymen when it acknowledged that the evidence "is technical and scientific and calls for expert testimony." And even with the benefit of hindsight, expert testimony, and a three-day hearing, the causal connection can best be described as questionable. LIRC admits that "neither Cohen nor Dr. Siegel gave unequivocal opinions that Carlson's behavior on February 18, 2010 was caused by his mental illness." The most it could say was that "his behavior was outside his normal pattern of behavior, and was consistent with several of the symptoms of his illness." "Consistent with" is the language of correlation, not causation. Nonetheless, LIRC found causality in both incidents.

¶51 With all the benefit of hindsight, LIRC's belief that there is substantial evidence of a causal connection between Mr. Carlson's disability and his conduct may be reasonable. But that is not the issue we must address. Our task here is to determine whether there is substantial evidence in the record that Wisconsin Bell, not LIRC, knew that Mr. Carlson's bipolarism caused his conduct. And we must answer that inquiry as of the date Wisconsin Bell terminated Mr. Carlson's employment, not retrospectively with the benefit of a three-day

hearing and the testimony of two experts. Based on the record before us, and for the reasons described above, we conclude there is no substantial evidence that Wisconsin Bell knew Mr. Carlson's disability caused his conduct on April 20, 2011.[20]

¶52 For the sake of completeness, we note that LIRC addressed the state of Wisconsin Bell's knowledge as of April 20, 2011, but cryptically, and not for the purpose of discovering discriminatory intent. After an employee proves the employer intentionally discriminated against him because of his disability, the employer may nonetheless avoid liability by proving the disability prevented the employee from adequately undertaking his job-related responsibilities. See Wis. Stat. § 111.34(2)(a).[21] The inquiry under § 111.34(2)(a), however, does not commence until after there is a conclusion that the

---

[20] This does not require us to set aside any of LIRC's factual findings because, in determining whether Mr. Carlson established that Wisconsin Bell intentionally discriminated against him because of his disability, it made no findings at all about whether Wisconsin Bell knew of the causal connection between the disability and his conduct.

[21] Wisconsin Stat. § 111.34(2)(a) provides:

Notwithstanding s. 111.322, it is not employment discrimination because of disability to refuse to hire, employ, admit or license any individual, to bar or terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment, membership or licensure.

employer engaged in intentional discrimination pursuant to Wis. Stat. § 111.322. See Target Stores, 217 Wis. 2d 1 at 9-10. At that stage of the analysis, the employer has the burden of proving it satisfied the terms of § 111.34(2)(a). Target Stores, 217 Wis. 2d 1 at 9-10. LIRC said Wisconsin Bell could not have had a good-faith belief in its need to terminate Mr. Carlson's employment under this provision because the evidence available to it demonstrated his disability caused his conduct: "[I]t was not an act of good faith for [Wisconsin Bell] to proceed with termination on the assumption that Carlson was lying about his ability to work on April 20th, in the face of the information that Carlson had presented to them from his doctor and therapist about his bipolar disorder as a cause for his conduct." Even if LIRC had included this in the "intent to discriminate" part of its analysis, it would not change our conclusion. The information provided by Mr. Carlson's doctor and therapist did not mention "his bipolar disorder as a cause for his conduct." It said nothing about his conduct at all, much less provide a link between it and his disability.

¶53 Wisconsin Bell terminated Mr. Carlson's employment because he violated the "last chance agreement" when he used the health code to avoid taking customer calls, engaged in personal conversations with his co-workers on the Q-Chat system, and left work before he finished his shift. There is no substantial evidence that Wisconsin Bell knew that Mr. Carlson's disability caused this conduct. Therefore, Wisconsin Bell did not

discriminate against Mr. Carlson "because of" his disability in violation of Wis. Stat. § 111.322. The case must be dismissed.[22]

## IV. CONCLUSION

¶54 We hold that LIRC may not conclude that a violation of Wis. Stat. § 111.322(1) occurred by using the inference method of proving intentional discrimination unless the employee proves the employer knew his disability caused the conduct on which the employer based an adverse employment decision. And the employer must have had this knowledge at the time it made the decision. Because the record lacks substantial evidence that Wisconsin Bell knew Mr. Carlson's disability caused his conduct on April 20, 2011, we reverse the court of appeals and dismiss Mr. Carlson's complaint.

*By the Court.*—The decision of the court of appeals is reversed and the case is dismissed.

---

[22] We need not reach the parties' discussion of whether Wisconsin Bell failed to reasonably accommodate Mr. Carlson's disability under Wis. Stat. § 111.34(1)(b). That issue does not arise until the employee establishes his employer intentionally discriminated against him because of his disability in violation of § 111.322. Mr. Carlson has not made that showing, and so this issue is moot. See Target Stores, 217 Wis. 2d at 9-10; see also Hutchinson Tech, Inc. v. LIRC, 2004 WI 90, ¶32, 273 Wis. 2d 394, 682 N.W.2d 343; Crivello, ERD Case No. 9252123 (LIRC Aug. 14, 1996) ("Obviously, an employer is not required to raise the issue of accommodation if the employer is unaware of an employe[e]'s handicap . . . .").

¶55 ANN WALSH BRADLEY, J. *(dissenting).* The majority upholds Charles Carlson's termination, concluding the record lacks substantial evidence that the termination was "because of" Carlson's disability. In doing so, it removes the teeth from the Wisconsin Fair Employment Act's protections and creates an unworkable standard. By tossing out the long established inference method of proof in employment discrimination cases, the majority places an untenable burden on all employees with disabilities, and those with mental health disabilities in particular.

¶56 Thus, the majority becomes the only entity reviewing this matter that discards the inference method and concludes that the termination is lawful. It alone declines to heed the warning that "if the law fails to protect the manifestations of [a] disability, there is no real protection in the law because it would protect the disabled in name only." Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1095 (9th Cir. 2007).

¶57 I would heed that warning. Because I agree with the administrative law judge who upheld the use of the inference method and determined that Carlson was wrongfully terminated; and with a unanimous LIRC that applied the inference method, determining that Wisconsin Bell wrongfully terminated Carlson; and with the circuit court that concluded that use of the inference method was reasonable; and with the unanimous court of appeals that embraced the long standing use of the inference

method and agreed with LIRC that Carlson was wrongfully terminated, I respectfully dissent.

I

¶58 Prior to his termination, Carlson worked for Wisconsin Bell for approximately 25 years. Majority op., ¶7. During this time, Carlson made his employer aware of his bipolar disorder, providing letters from his doctors. Id., ¶11.

¶59 The letters identified Carlson's diagnosis as "bipolar disorder-depressed type." Id. They also indicated that "[b]ipolar disorder is a condition characterized by extremes of mood that could manifest in a significant depression with or without problems associated with anxiety and irritability" and that "[e]xtremes of moods can occur rather quickly and [are] often triggered by relatively minor frustrations." Id.

¶60 At the time of the events giving rise to his claim, Carlson worked in a Wisconsin Bell call center as a Technical Service Representative. Wisconsin Bell terminated Carlson's employment after Carlson entered a call-blocking health code[1] subsequent to learning that he had not passed a test required for a position in another department. Id., ¶¶15-20. While he

---

[1] As the majority opinion explains, Technical Service Representatives generally receive calls based on their availability. Majority op., ¶8. They can, however, control receipt of calls by making themselves unavailable by entering certain call-blocking codes, such as for meal and rest breaks, short health breaks, and training and staff meetings. Id. Improper use of call blocking codes to avoid taking calls could result in immediate termination. Id.

was in the health code status, Carlson "Q-chatted"[2] with co-workers. Id., ¶¶15-16. Carlson asserted that he entered the health code because he was upset after learning of his test result and that he reached out to co-workers as a coping mechanism. Id., ¶19.

¶61 Carlson brought an employment discrimination claim on the basis of disability. An administrative law judge reinstated Carlson and LIRC upheld that decision. Id., ¶24. In doing so, LIRC applied the "inference method" of determining discriminatory intent. Pursuant to this method, "if an employer discharges a disabled employee for some unsatisfactory conduct, and the employee is able to show that his or her conduct was caused by a disability, the discharge was 'in legal effect' because of the employee's disability." Id., ¶25.

¶62 The majority concludes that LIRC's "inference method" is inconsistent with Wis. Stat. § 111.322(1)[3] because it excuses the employee from the burden of proving discriminatory intent. Majority op., ¶3. It further determines that the record lacks substantial evidence that Wisconsin Bell terminated Carlson's employment because of his bipolar disorder. Id.

_____

[2] "Q-chat" is an internal instant messaging program used by Wisconsin Bell.

[3] Wis. Stat. § 111.322(1) provides in relevant part: "[I]t is an act of employment discrimination to . . . terminate from employment . . . any individual . . . because of any basis enumerated in s. 111.321." Among the bases enumerated in § 111.321 is "disability."

3

II

¶63 The majority removes the teeth from the Wisconsin Fair Employment Act's protections. To succeed on his disability discrimination claim, Carlson must demonstrate that he has a disability, that he received an adverse action from his employer, and that the adverse action was "because of" his disability. Wal-Mart Stores, Inc. v. LIRC, 2000 WI App 272, ¶9, 240 Wis. 2d 209, 621 N.W.2d 633; Target Stores v. LIRC, 217 Wis. 2d 1, 9, 576 N.W.2d 545 (Ct. App. 1998). Additionally, the employer must have acted with discriminatory intent. Racine Unified Sch. Dist. v. LIRC, 164 Wis. 2d 567, 595, 476 N.W.2d 707 (Ct. App. 1991).

¶64 LIRC's inference method of demonstrating discriminatory intent is based on the premise that the symptoms of a disability are inseparable from the disability itself. If the employee is intentionally discriminated against because of a symptom of a disability, that is the same as intentional discrimination on the basis of the disability.

¶65 This premise is reasonable and correct. As amicus Disability Rights Wisconsin and the Survival Coalition of Wisconsin persuasively explain by way of analogy, "[e]pilepsy and seizure go hand-in-hand." If an employer terminates an employee with epilepsy for having a seizure, that employee is in effect being terminated "because of" having epilepsy. Likewise here, Carlson was terminated because of his reaction to learning he did not pass a test and the steps he took to reach out to coworkers for support as a means of coping with his bipolar

4

disorder.    The   termination   was   "because   of"   his   bipolar disorder.[4]

¶66  Contrary  to  the  majority's  assertion,  the  inference method  does  not  relieve  the  employee  of  the  burden  to  prove intent.    Rather,  it  reasonably  equates  discrimination  against the  symptoms  of  a  disability  with  discrimination  against  a person  who  has  a  disability.    See  Gambini,  486  F.3d  at  1093. The  employee  still  must  show  a  causal  link  between  the manifested symptoms and the adverse action.

¶67  The  inference  method  is  not  overly  restrictive  on employers.    An  employer  can  still  terminate  the  employee  if  he "cannot      'adequately      undertake      the      job-related responsibilities.'"    Target Stores,  217 Wis. 2d at 10  (quoting Wis. Stat. § 111.34(2)(a)).    The  majority,  however,  errs  in  the other  direction.    Its  restriction  on  the  use  of  the  inference method  gives  an  employer  carte  blanche  to  fire  an  employee

---

[4] LIRC's  finding  of  fact  number  24  aptly  describes  this causal link:

> Carlson's mood and his inability to work on April 20, 2011 upon learning that he failed the collections test were caused by his bipolar disorder.  The Q-chats he engaged in were reflective of his mood disorder, and were consistent with his psychotherapist's recommendation that he reach out to others for support as a means of coping with his mood.  The fact that he used slang, including some humor, and checked on the consequences of his taking a medical leave, were not inconsistent with the conclusion that his mood and inability to work were a manifestation of his mental illness.  He was unable to work because of symptoms of his mental illness, and appropriately used the health code and sick leave just as it was available to any sick employee.

because of a symptom of a disability, as long as the employer does not overtly state that the disability is the reason for the dismissal.

¶68 *Gambini* forewarned: "[I]f the law fails to protect the manifestations of [a] disability, there is no real protection in the law because it would protect the disabled in name only." 486 F.3d at 1095. Similarly, over four decades ago, the United States Supreme Court cautioned that disability discrimination laws are necessary not only to protect against prejudice, but to combat "the fact that the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] people with [disabilities]." *School Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 279 (1987) (citation omitted).

¶69 The Wisconsin Fair Employment Act is to be "broadly interpreted to resolve the problem it was designed to address." *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶46, 264 Wis. 2d 200, 664 N.W.2d 651 (quoting *McMullen v. LIRC*, 148 Wis. 2d 270, 275, 434 N.W.2d 830 (Ct. App. 1988)). The purpose of the law is "to encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of any [disabilities]." *McMullen*, 148 Wis. 2d at 275. The majority's restrictive interpretation undermines this purpose and provides no protections at all to employees with disabilities.

6

III

¶70 Further, the majority's approach is unworkable.  By decoupling the disability from its symptoms and requiring an employer's knowledge of a disability prior to the adverse action, the majority places an impossible burden on an employee with a disability.  This burden falls particularly heavily on those with mental health conditions that are not always immediately apparent to a layperson or employer.

¶71 The majority states that "[e]xcusing the employee from proving the employer's knowledge of the causal connection allows LIRC to find intentional discrimination where there is no proof of it."  Majority op., ¶40.  Yet it concedes that "[t]he consequences of bipolarism are not matters of common knowledge." Id., ¶46.  It then concludes that "[b]ecause of the amorphous nature of this disability, an employee's bare assertion of causality cannot be credited as authoritative." Id.  Thus, the majority examines what Wisconsin Bell knew at the time it terminated Carlson's employment. Id., ¶47.

¶72 So what did Wisconsin Bell know at the time it terminated Carlson's employment?  As the majority details, Wisconsin Bell knew a full year before the incident that led to his dismissal that Carlson had bipolar disorder that could manifest in significant depression. Id., ¶11.  It knew that bipolar disorder may include "[e]xtremes of moods" that "can occur rather quickly and [are] often triggered by relatively minor frustrations." Id.  It knew that Carlson was receiving psychotherapy. Id.

7

¶73 Yet despite the fact that these letters precisely describe the actions that ultimately led to Carlson's termination, the majority discounts the letters because they do not mention any "causal nexus" between bipolar disorder and Carlson's conduct. See id., ¶¶46-47. With Wisconsin Bell's knowledge of Carlson's condition and its manifestations, one wonders what kind of nexus would satisfy the majority.

¶74 The majority's requirement that the employer have knowledge of the disability prior to the adverse action encourages rash and uninformed decision-making on the part of employers. Under the majority's approach, an employee must provide immediate medical proof that an action was caused by a disability or face termination. This is a nearly impossible hurdle.

¶75 What are Carlson and others similarly situated to do? Should they notify their employers of their mental health conditions and all of their possible manifestations immediately upon being hired in order to protect their employment if symptoms manifest themselves at a later date? But it is often impossible to predict in advance all of the ways that a disability may manifest itself in a workplace. Symptoms as well as work environments may change and disabilities may progress and regress. This burden falls particularly severely on those with mental health disabilities, which are less apparent to the layperson.

¶76 If employees do not present a sufficient medical report prior to an adverse action, how are they going to meet

8

the majority's apparent requirement that medical proof be immediately available in order to thwart termination? Such a requirement seems divorced from the reality of medical treatment and workplace relations.

¶77 Often a medical professional will want to have an appointment with the employee to discuss what happened before issuing a report on causation. Scheduling medical appointments and receiving subsequent reports opining on causation will likely take weeks, if not longer, to accomplish.

¶78 Further, the specter of providing a disclosure of all possible manifestations, even if they may never happen, puts an employee in a very difficult position. It forces an employee to disclose a mental health disability and its potential manifestations just in case. Aside from being an unnecessary invasion of privacy and potentially embarrassing, it also may discourage people with disabilities from applying for employment in the first place. Far from advancing the purpose of the WFEA, the majority's unworkable approach runs completely counter to its objectives.

¶79 On the other hand, application of the inference method of determining discriminatory intent avoids placing an undue burden on people with disabilities. Further, it gives meaning to the protections of the Wisconsin Fair Employment Act and avoids rendering those protections merely illusory.

¶80 For the foregoing reasons, I respectfully dissent.

¶81 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

9