KESSLER, P.J.
¶ 1 Harley-Davidson Motor Company Group, LLC and Transportation Insurance Company (collectively, Harley-Davidson) appeal an order of the circuit court affirming a decision of the Labor and Industry Review Commission (LIRC) that found Robert Schulfer incurred an 84.67% hearing loss as a result of his employment at Harley-Davidson. We affirm.
BACKGROUND
¶ 2 The following facts are taken from LIRC's record. Schulfer worked in the power train assembly division of Harley-Davidson from May 2000 until February 2011. Following his retirement, Schulfer underwent multiple hearing tests, known as pure tone conduction audiometry tests (pure tone tests). On March 13, 2011, Schulfer underwent pure tone testing at Avada Audiology and Hearing Care (Avada).[1] The test showed moderate to severe hearing loss in both ears, but also showed no hearing loss in either ear at some frequencies. On April 4, 2011, Schulfer underwent another pure tone test at a Concentra health facility. The results indicated that Schulfer had a near 100% hearing loss in both ears.
¶ 3 After the Concentra test, Schulfer purchased hearing aids from Avada and submitted the bill to Harley-Davidson. Harley-Davidson's claims services provider, Gallagher Bassett, did not reimburse Schulfer for the hearing aids and requested that Schulfer undergo a medical examination by Dr. Michael Nordstrom. Dr. Nordstrom examined Schulfer on January 19, 2012. Dr. Nordstrom concluded that Schulfer "no doubt has hearing loss," but could not determine the severity because of "the inaccuracy of the [pure tone] test results." Dr. Nordstrom noted that while the pure tone test results indicated severe hearing loss, Schulfer's "[s]peech reception thresholds" indicated otherwise. Dr. Nordstrom was unable to determine whether Schulfer's employment with Harley-Davidson caused the hearing loss and suggested that Schulfer's "presentation is secondary to pseudohypacusis." In other words, Dr. Nordstrom suggested that Schulfer may have been faking his hearing loss or exaggerating the pure tone test results.
¶ 4 On May 24, 2012, Schulfer filed an occupational hearing loss claim with the Wisconsin Department of Workforce Development (DWD). Prior to the evidentiary hearing, Schulfer submitted two reports from Dr. Matthew Ubell. Dr. Ubell's first report, dated December 26, 2012, disagreed with Dr. Nordstrom's report and concluded that Schulfer incurred hearing loss as a result of his employment with Harley-Davidson. The report also concluded that the Avada test conducted on March 13, 2011, yielded the most accurate results.
¶ 5 On June 23, 2013, Dr. Ubell submitted a follow-up report retracting his conclusion that the March 13, 2011 test was the most accurate and instead concluded that the April 4, 2011 Concentra pure tone test was the "most indicative of Mr. Schulfer's work-related hearing loss." Dr. Ubell explained that "[t]he March 13, 2011 audiogram contains zeros at several frequencies. Based upon [the] other audiograms, which demonstrate a profound loss of hearing, I understood these zeros to be non-response markings. This is sometimes done by audiologists as shorthand.... I believe that it is only appropriate that I disregard the March 13, 2011 audiogram and instead rely upon the audiogram dated April 4, 2011 as being most indicative of Mr. Schulfer's work-related hearing loss." (Some formatting altered.) Dr. Ubell also disagreed with Dr. Nordstrom's suggestion that Schulfer could have been faking his hearing loss. Dr. Ubell stated that patients who fake hearing loss would struggle with hearing testing because of the multiple frequencies that are tested and because the amplified sound coming from hearing aids would likely be uncomfortable for a patient faking his or her loss. Dr. Ubell ultimately concluded that Schulfer "demonstrates a loss of 100% permanent partial disability."
¶ 6 Harley-Davidson submitted Dr. Nordstrom's January 19, 2012 report, as well as a follow-up report in which Dr. Nordstrom reiterated his earlier conclusions. Dr. Nordstrom also refused to attribute Schulfer's hearing loss to his employment with Harley-Davidson, calling such a conclusion "medically speculative." Dr. Nordstrom stated that Schulfer could have had a pre-existing hearing loss.
¶ 7 Ultimately, an evidentiary hearing was held over two days. The Administrative Law Judge (ALJ) for the DWD found Dr. Ubell's report credible and determined that Schulfer sustained work-related binaural hearing loss, resulting in 100% permanent partial disability. The ALJ awarded Schulfer compensation, attorney fees, costs, and treatment expenses. The order was interlocutory, reserving jurisdiction in the event of future claims.
¶ 8 On July 1, 2014, Harley-Davidson petitioned LIRC for review of the ALJ's decision. LIRC remanded the matter to the DWD for "an independent medical opinion from an impartial and qualified physician specializing in otolaryngology, to be appointed by the department." LIRC requested that the independent physician submit an opinion regarding "1) the scientific basis in general for auditory brainstem response (ABR) testing as a means for determining whether a hearing loss measured by standard testing is affected by pseudohypacusis; and 2) whether, given the medical evidence of record in this matter, ABR testing could detect whether the applicant's auditory test results in evidence were affected by pseudohypacusis." LIRC appointed Dr. Steven Millen to conduct the examination.
¶ 9 Dr. Millen conducted both a pure tone audiometry test and a speech reception threshold test (SRT). Dr. Millen's report stated: "if one only looks at the pure tone audiogram, [Schulfer's] hearing would be in the 75-90 dB range through the speech frequencies. However if one looks at the SRT it is at a 50-55 dB level. Therefore again we have significant inconsistencies audiometrically, between pure tone testing and speech testing."[2] Dr. Millen concluded that Schulfer "has a significant sensorineural hearing loss" due to "noise exposure in the work environment." However, because of the inconsistencies in Schulfer's testing, Dr. Millen used the results of the speech reception threshold test to calculate the percentage of compensable hearing impairment. Dr. Millen's calculation method was contrary to WIS. ADMIN. CODE § DWD 80.25(4) (May 2018), which requires the calculation to be based on pure tone testing. Dr. Millen acknowledged "that that is not how compensation levels are generally calculated," but found using the speech threshold test to be a "reasonable alternative" due to the complicated nature of the case and "poor patient reliability." Dr. Millen ultimately opined that Schulfer had thirty-two percent hearing loss in his right ear and forty percent hearing loss in his left ear for a binaural loss of 33.3%.
¶ 10 Following Dr. Millen's report, Dr. Ubell submitted a follow-up report, disagreeing with Dr. Millen's use of speech reception threshold testing as the basis of his calculation. Dr. Ubell stated that pure tone testing is the most appropriate test for measuring hearing loss because "Schulfer's hearing loss is skewed to the higher frequencies, and the speech reception threshold may underestimate [Schulfer's] overall disability." Dr. Ubell again stated that the Concentra test was the most accurate and that Schulfer had 100% permanent partial disability.[3]
¶ 11 On September 30, 2016, LIRC issued a decision affirming in part and reversing in part the ALJ's decision. LIRC concluded that Schulfer sustained work-related binaural hearing loss, but found the loss to be an 84.67% partial permanent disability.[4] In reaching its conclusion, LIRC evaluated the reports of each medical professional, finding Dr. Millen's pure tone test to be the most reliable. LIRC noted that Dr. Millen himself did not calculate Schulfer's hearing loss based on the pure tone test results, but found Dr. Ubell's explanation as to the reliability of pure tone tests to be credible. LIRC also noted that WIS. ADMIN. CODE § DWD 80.25(4)"do[es] not endorse any test other than the pure tone test to determine hearing impairment."
¶ 12 Harley-Davidson appealed LIRC's determination to the circuit court, arguing that credible and substantial evidence did not support LIRC's findings because LIRC relied on Dr. Millen's pure tone test, which Dr. Millen himself found unreliable. The circuit court affirmed LIRC's determination. This appeal follows.
DISCUSSION
¶ 13 On appeal, Harley-Davidson argues that LIRC's decision was not supported by credible and substantial evidence because none of the medical opinion evidence supports LIRC's determination and none of the medical experts opined that Schulfer sustained an 84.67% binaural hearing loss. Harley-Davidson's appellate arguments require us to reweigh the evidence before LIRC, which we cannot do. See Xcel Energy Servs., Inc., v. LIRC , 2013 WI 64, ¶ 48, 349 Wis. 2d 234, 833 N.W.2d 665.
¶ 14 On appeal, this court reviews LIRC's decision, not that of the circuit court. See City of Kenosha v. LIRC , 2011 WI App 51, ¶ 7, 332 Wis. 2d 448, 797 N.W.2d 885. " 'LIRC's findings of fact are conclusive on appeal so long as they are supported by credible and substantial evidence.' " Michels Pipeline Constr., Inc. v. LIRC , 197 Wis. 2d 927, 931, 541 N.W.2d 241 (Ct. App. 1995) (citation omitted). When we review the sufficiency of credible evidence to support an administrative agency's decision, we need find only that the evidence is sufficient to exclude speculation or conjecture. See L & H Wrecking Co., Inc. v. LIRC , 114 Wis. 2d 504, 508, 339 N.W.2d 344 (Ct. App. 1983). The reviewing court's task is to search the record to locate evidence that supports LIRC's decision, rather than weighing evidence opposed to the decision. See Vande Zande v. DILHR , 70 Wis. 2d 1086, 1097, 236 N.W.2d 255 (1975).
¶ 15 "[W]e will review an administrative agency's conclusions of law under the same standard we apply to a circuit court's conclusions of law-de novo." Tetra Tech EC, Inc. v. Wisconsin Dep't of Revenue , 2018 WI 75, ¶ 84, --- Wis. 2d ----, --- N.W.2d ----. "[W]e review the administrative agency's decision, not that of the circuit court." Id. "Our review of LIRC's findings of fact is limited: 'If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.' " Wisconsin Bell, Inc. v. LIRC , 2018 WI 76, ¶ 30, --- Wis. 2d ----, --- N.W.2d ---- (citation omitted). "We will set aside or remand a matter to the agency based on a factual deficiency only if 'the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.' " Id. (citation omitted). " 'Substantial evidence does not mean a preponderance of evidence. It means whether, after considering all the evidence of record, reasonable minds could arrive at the conclusion reached by the trier of fact.' " Id. (citation omitted).
¶ 16 With these standards in mind, we conclude that LIRC's findings are supported by substantial and credible evidence in the form of multiple medical opinions and pure tone test results. Based on both Dr. Millen's and Dr. Ubell's reports, LIRC determined that Schulfer was not faking his hearing loss; thus, ruling out Dr. Nordstrom's conclusions. LIRC also found that the hearing loss was work-related, relying on Dr. Millen and Dr. Ubell's reports, as well as finding Schulfer's testimony before the ALJ to be credible.
¶ 17 As to LIRC's determination that Schulfer sustained an 84.67% hearing loss, LIRC explained that it used the results of Dr. Millen's pure tone test and the mathematical formula mandated by WIS. ADMIN. CODE § DWD 80.25(9). LIRC acknowledged that Dr. Millen himself did not use the pure tone test results to calculate Schulfer's hearing loss, but also noted that Dr. Millen did not rule out the possibility that his pure tone test could accurately measure Schulfer's hearing loss. Dr. Millen stated that he used the speech reception threshold test to measure Schulfer's hearing loss because Schulfer's case was "complicated" and Schulfer was "unreliable," but Dr. Millen did not state that the pure tone test was unreliable. LIRC found Dr. Millen's test to be the most credible because Dr. Millen was "the impartial tie breaker" and "the least susceptible to bias." LIRC also stated that the Wisconsin Administrative Code does "not endorse any test other than the pure tone test to determine hearing impairment [and] Dr. Millen has not stated a reasonable case for ignoring the formula in [ WIS. ADMIN. CODE § DWD 80.25(9) ]." Indeed, Dr. Ubell's follow-up report criticized Dr. Millen's use of the speech reception threshold test, stating that pure tone tests are the most accurate method of measuring hearing loss. Accordingly, LIRC resolved the inconsistencies between the medical reports by relying on Dr. Ubell's explanation of the testing methods and Dr. Millen's actual testing. "Where there are inconsistencies or conflicts in medical testimony, [LIRC], not the court, reconciles the inconsistencies and conflicts." See Valadzic v. Briggs & Stratton Corp. , 92 Wis. 2d 583, 598, 286 N.W.2d 540 (1979). LIRC's "finding[s] on disputed medical testimony [are] conclusive." See id. Therefore, we conclude that LIRC's findings are supported by substantial and credible evidence.
¶ 18 For the foregoing reasons, we affirm.
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

Pure tone audiometry testing is a behavioral test that uses varying frequencies to measure the degree of hearing loss. See Hearing Doctors of Georgia: What Is Pure Tone Audiometry , https://hearingdoctorsofga.com/our-blog/what-is-pure-tone-audiometry (last visited June 26, 2018).

Hearing loss is measured in decibels (dB). Hearing in the seventy-five to ninety dB range indicates severe loss. Hearing in the fifty to fifty-five dB range indicates moderate hearing loss. See Hearing Doctors of Georgia: What Is Pure Tone Audiometry , https://hearingdoctorsofga.com/our-blog/what-is-pure-tone-audiometry (last visited June 26, 2018).

Dr. Nordstrom did not provide a follow-up report because at that time he had become affiliated with the same medical practice as Dr. Millen.

Wisconsin Admin. Code § DWD 80.25(8) provides a table to calculate the percentage of compensable hearing impairment according to the decibel hearing loss as found in the pure tone audiometry. Section DWD 80.25(9) provides a specific formula which requires "[o]btain[ing] for each ear the average hearing level in decibels at the 4 frequencies, 500, 1,000, 2,000 and 3,000 Hz.," converting the average into a percentage loss based on § DWD 80.25(8), and then determining the percentage loss in both ears.